Robert M. BANDY, Administrator of
the Estate of Leport Walton,
Deceased, Petitioner,

v.

FIRST STATE BANK, OVERTON,
TEXAS, Respondent.

No. D–0946.

Supreme Court of Texas.

June 10, 1992.

Rehearing Overruled Sept. 9, 1992.

Robert M. Bandy, pro se.

Dean W. Turner, Henderson, M. Keith Dollahite and James Hedrick, Tyler, for respondent.

## OPINION ON MOTION
## FOR REHEARING

CORNYN, Justice.

The Petitioner's Motion for Rehearing is granted. Our opinion and judgment of April 22, 1992, are withdrawn and the following is substituted therefor:

This case requires us to decide whether a bank which is both a creditor and a debtor of a deceased person's estate has an equitable right to setoff the assets of the estate against the estate's debts without following the claim procedures found in the Texas Probate Code. The trial court found that such acts constituted conversion and awarded the estate actual and consequential damages of $61,118.66, punitive damages of $140,572.92, prejudgment interest, and attorney's fees. The court of appeals reversed the trial court's judgment and remanded the cause for a new trial, holding that the bank had exercised its equitable right to setoff the deceased person's assets against his debts. We affirm the judgment of the court of appeals.

### I.

LePort Walton died intestate on October 20, 1986. He had been the owner of two clubs (the "Climax Club" in Tyler and the "Corner Club" in Owentown), a grocery (the "Walton Grocery" in Tyler), and two farms. Walton had been a customer of the First State Bank, Overton, Texas (the "Bank") for some years. At Walton's death, his debt to the Bank was evidenced by six promissory notes. Walton had signed four of the notes as maker and co-signed the other two as co-maker. At his death, Walton had funds on deposit at the Bank in the form of a checking account and eight certificates of deposit (CDs).

Seven days after Walton's death the County Court of Smith County issued letters of administration to Lois Walton Henson and Joy Walton Moore as temporary co-administratrices of Walton's estate. The court order establishing the temporary administration limited the authority of the co-administratrices as follows:

1. To take charge and possession of decedent's businesses described and located as follows:

    a. Climax Club—South of Tyler

    b. Corner Club—Owentown

    c. Walton Grocery—Rt. 3, Tyler

    d. Two farms

(Including all of the assets of the businesses).

2. To conduct the businesses, including the usual and customary operations

such as, but not limited to, sales of goods, collection of accounts receivable, payment of accounts payable and other debts as due, payment of employee's [sic] salaries, purchase and payment for additional equipment and supplies, and other acts necessary to the general operation of the business pending further order of this Court.

3. To take possession of all cash on hand and on deposit in the name of the business, or in the name of the decedent, to be authorized to make deposits and withdrawals from all such accounts as may be necessary for the operation of the business, and to borrow money necessary for the operation of the business, pledging assets of the business if necessary to secure payment of the loans.

4. To execute instruments necessary to operate the business, to deal with regulatory agencies as necessary, to hire, supervise, and terminate employees, to employee [sic] attorney's [sic] and accountant's [sic] necessary for the operation of the business, and for this temporary administration, to bring and defend lawsuits if necessary, to exercise all rights necessary to protect the businesses and the assets of the estate, and to pay court costs and necessary expenses and attorney's fees.

On November 24, 1986, Mrs. Henson and Mrs. Moore presented their letters of temporary administration to the Bank and inquired as to the amount Walton owed the Bank and the amount Walton had on deposit. They then indicated that they wanted to use the funds Walton had on deposit in the Bank to pay the amount due on Walton's notes. In response, the Bank produced CD 10021, payable to Laura W. Walton or Leport Walton with a face value of $11,537.93. Mrs. Henson endorsed the CD to the Bank, which applied the proceeds to pay the approximately $14,000 due on note number 97670.

Mrs. Henson and Mrs. Moore made two more visits to the Bank. On December 15, 1986, Mrs. Moore endorsed to the Bank CD 9281, which was payable to Leport Walton and the Bank with a face value of

$5,833.04, and CD 9372, which was payable to Leport Walton with a face value of $6,432.70. The Bank applied the proceeds plus Mrs. Henson's check for $752.00 to pay the amount due on a note for $16,500.00 which came due on November 24, 1986. On December 24, 1986, Mrs. Moore endorsed to the Bank CD 4303, which was payable to Leport Walton d/b/a Climax Club and had a face value of $4,500.00, and CD 9618, which was payable to Leport Walton and the Bank and had a face value of $6,827.43. The Bank applied those proceeds to pay the amount due on a note for $17,443.23 which was to come due on January 7, 1987. Henceforth, we will refer to the five CDs signed by Mrs. Henson during the temporary administration as the "temporary administration CDs."

The temporary administration expired on December 30, 1986 and was not renewed. Subsequently, on January 19, 1987, Robert M. Bandy was appointed administrator. Between those dates, when the estate had no administrator, the Bank setoff Walton's checking account to pay the amount due on a note for $8,244.28 (the Anders note) which Walton had co-signed with a third party. The note, which was secured by 34 head of cattle, had come due on November 7, 1986.

On January 27, 1987, shortly after being appointed administrator, Bandy requested that the Bank release funds on deposit in Walton's checking accounts. In response, the Bank issued to Bandy three cashier's checks totalling $27,101.86.

A few days later, on February 2, 1987, Mrs. Henson endorsed CD 12229 with a face value of $2000.00 and the Bank paid the full amount due to Mrs. Henson. CD 12229 was payable to either Walton or Mrs. Henson.

On March 13, 1987, Bandy discovered that the Bank was holding two CDs payable to Walton and filed an application with the County Court for authority to withdraw those CDs. The court issued an ex parte order directing the Bank to release to Bandy CD 10206, CD 9355, and any other assets of Walton's estate that it had on deposit. Armed with the ex parte order, Ban-

dy demanded that the Bank release the two CDs. There is some dispute as to how Bandy made his demand. Bandy claims that he sent a copy of the ex parte order to the Bank. The Bank denies ever receiving the ex parte order and claims that Bandy only made an oral demand by telephone. In any case, the Bank refused to comply with Bandy's demand.

The Bank again exercised its claimed right of setoff when another note (the land note) came due. Walton had given the Bank a note for $45,000.00 which was payable in six semi-annual payments of $7,500.00 beginning in February, 1984. The note was secured by a deed of trust on a parcel of land. When the estate failed to make the last payment due on February 8, 1987, the Bank setoff a portion of CD 9355 to make the last payment. The Bank issued CD 13294, payable to the estate of Leport Walton, for the balance remaining in CD 9355 after the setoff.

The Bank performed all of these actions without submitting any claims to the estate or the County Court. Finally, on May 6, 1987, the Bank submitted two sworn claims to Bandy as administrator of Walton's estate. One claim sought retroactive approval for its April 10th setoff of CD 9355. The other requested payment of a loan that Walton had co-signed and on which the debtor had recently gone into default. On June 5, 1987, Bandy rejected both claims.

Some time later, the Bank again exercised its claimed equitable right of setoff to satisfy the deficiency on the note that Walton had co-signed and which was the subject of one of the claims that Bandy had rejected (the Jarmon note). The setoff was precipitated when the Bank repossessed the collateral, a truck, and sold it for less than the amount due on the note. To pay off the deficiency, the Bank setoff a portion of CD 10206. The Bank incurred $2,250.72 in attorney's fees to perform the repossession and sale of the collateral.

On October 13, 1987, Bandy filed with the County Court an application to sell the estate's land where Walton's Grocery was located. Bandy stated that the sale of the property was necessary to secure funds to pay expenses of administration and debts of the estate. On October 28, 1987, the court ordered the sale of the property.

On October 30, 1987, Bandy sold the property at a private sale for $68,600.00. At trial, Bandy testified, over the Bank's objection, that the land's fair market value was $100,000.00. Bandy also testified, again over the Bank's objection, that the sale was necessary because of cash flow problems caused by the Bank's unauthorized setoffs.

Bandy sued the Bank in the County Court at Law of Smith County, claiming that the Bank had converted the eight CDs that were payable to Walton at his death. Bandy also claimed damages associated with the below-market-value sale of the land where the grocery store was situated and punitive damages. In its original answer, which was filed before the sale of the land and the setoff of CD 10206, the Bank claimed that the temporary administration CDs had been "duly endorsed by the legal representatives of the Estate of Leport Walton, Deceased, and were applied toward the indebtedness of the said Leport Walton, Deceased, to said Bank." The Bank further claimed that Mrs. Henson, the joint owner of CD 12229, had indorsed CD 12229 and it was properly payable to her as joint owner. Additionally, the Bank claimed the equitable right to setoff CD 9355 against a debt owed by Leport Walton to the Bank. Finally, the Bank answered that it still held CD 10206 which it was later to setoff to make up the deficiency on the note secured by the truck.

Trial was held without a jury. The trial court ruled that the Bank had converted each of the eight CDs. In addition, the trial court found that the Bank, as a consequence of its wrongful actions, had caused the estate to experience severe cash flow problems which in turn forced the estate to sell at a loss the real property known as Walton's Grocery. Finally, the trial court found that the Bank had acted with malice and ill will when it refused Bandy's demand to turn over the funds on deposit. Consequently, the trial court awarded actual damages in the amount of $61,118.66 and

punitive damages in the amount of $140,-572.92. The record does not disclose how the court arrived at those figures.

On appeal, the court of appeals held that the Bank had an equitable right to setoff Walton's debts against Walton's bank accounts and CDs. Consequently, the court of appeals reversed the trial court's judgment and remanded the cause to the trial court for a new trial. The court of appeals also offered some guidance to the trial court concerning CD 12229 which was payable to Mrs. Henson or Leport Walton. The court noted that the Bank was correct in paying CD 12229 to Mrs. Henson on her endorsement. The court reasoned that the Texas Probate Code protects from liability financial institutions that allow one of the joint owners of a joint account to withdraw funds when the other owners or their representatives have not given written notice to the financial institution to stop such withdrawals. We granted Bandy's application for writ of error to determine if a bank has an equitable right to setoff the assets of a deceased person's estate without following the claim procedures found in the Texas Probate Code.

## II.

Bandy offers two challenges to the court of appeals's failure to affirm the trial court's decision concerning the temporary administration CDs. Both challenges fail. First, Bandy argues that the temporary administration was void because the County Court did not require the temporary administratrices to give bond. Consequently, Bandy argues, any action taken by the temporary administratrices is also void, including the endorsing of the five CDs and the use of the proceeds to pay the amount due on some of Walton's notes.

■ Even if Bandy were correct and the temporary administratrices' actions were void, the Bank would not be liable for paying the temporary administratrices assuming payment was made in accordance with the court order establishing the temporary administration. The Bank had no duty to look behind the court order to assure itself that the temporary administra-

trices and the county court had complied with all of their statutory obligations. *See Maness v. Meyers,* 419 U.S. 449, 459, 95 S.Ct. 584, 591, 42 L.Ed.2d 574 (1975) (court order issued by court with subject matter and personal jurisdiction must be obeyed until reversed on appeal). In the absence of such a duty and under these circumstances, the Bank was not liable for following the temporary administratrices' instructions.

■ However, Bandy has not established that the temporary administratrices' actions were void. Bandy is correct in his assertion that the temporary administratrices should have given bond when their administration was established. The order appointing a temporary administrator must, among other things, specify "the amount of bond to be given by the appointee." TEX.PROB.CODE § 131A(c)(3). The Probate Code does not specify the bond amount but instead allows the judge to set it at an amount "sufficient to protect the estate and its creditors...." *Id.* at § 194(1). There are occasions, none of which apply here, where a bond is not required. *See id.* at § 195. Therefore, the temporary administratrices should have given bond prior to the establishment of the administration.

■ However, Bandy's attack on the temporary administratrices' authority is unavailing. Bandy's assertion in the County Court at Law that the temporary administratrices should have given bond is a collateral attack on the proceedings in the County Court. *See Empire Gas & Fuel Co. v. Albright,* 126 Tex. 485, 87 S.W.2d 1092, 1096 (1935). Evidence of matters outside the record of the proceeding being challenged will not be considered in a collateral attack unless the challenge asserts that the court had no possible power to grant the order. *Templeton v. Ferguson,* 89 Tex. 47, 33 S.W. 329, 332, 333 (1895). In this case, Bandy does not challenge the County Court's power over Walton's estate and property and over the subject matter of the temporary administration. Therefore, any attack on the County Court proceedings must be based on evidence in the

record of that proceeding. However, we do not have the record of the County Court proceeding before us. Since it was Bandy's responsibility to present us with a record of the proceeding he is attacking, TEX.R.APP.P. 51(b), his collateral attack must fail.

■ Bandy's second challenge to the court of appeals's reversal of the trial court's decision concerning the temporary administration CDs must also fail. The temporary administratrices endorsed the temporary administration CDs and used the proceeds to pay the amount due on notes evidencing Walton's debt to the Bank. Bandy asserts that these notes did not evidence loans taken out for business purposes. Therefore, Bandy argues, payment of those notes by the temporary administratrices was not for business purposes and was outside the authority granted by the County Court when it established the temporary administration.

"Temporary administrators shall have and exercise only such rights and powers as are specifically expressed in the order of the court appointing them, and as may be expressed in subsequent orders of the court.... Any acts performed by temporary administrators that are not so expressly authorized shall be void." TEX.PROB. CODE § 133(a); *Lambright v. Quick*, 214 S.W.2d 697, 698 (Tex.Civ.App.—Galveston 1948, writ ref'd n.r.e.); *see also Cobbel v. Crawford*, 120 S.W.2d 1085, 1086 (Tex.Civ. App.—El Paso 1938, no writ). In this case, the court order creating the temporary administration limited the temporary administratrices to actions performed to accomplish the business purposes of the estate. Therefore, if the temporary administratrices were not accomplishing business purposes of the estate when they endorsed the temporary administration CDs and paid the amount due on the estate notes then those acts were void.

However, Bandy produced no evidence that the notes paid by the temporary administratrices were taken out for other than business purposes. *See Lambright*, 214 S.W.2d at 699 (burden of proof on party challenging act of temporary admin-

istrator to show that the act was outside court ordered authority). Bandy elicited testimony from Mr. Fox, president of the Bank, that not all of the notes held by the Bank were taken out for business purposes but Mr. Fox stood firmly by his testimony that the notes paid by the temporary administratrices were taken out for business purposes. Mr. Fox also testified that the Bank kept a book in which it recorded the purpose for the loans that it extended. Bandy failed to ask the trial court to compel Mr. Fox to bring the record book when he was scheduled to return for further testimony and the contents of the book were, consequently, never entered into evidence. Thus, the record is barren of any evidence that the temporary administratrices acted outside their authority when they endorsed the temporary administration CDs and used the proceeds to pay the amount due on notes held by the Bank. Consequently, the temporary administratrices' acts with respect to these CDs are not void.

Therefore, we hold that the Bank's payment of the temporary administration CDs was proper and that the Bank neither set-off nor converted those CDs.

### III.

■ Bandy next challenges the court of appeals's reversal of the trial court's decision concerning CD 12229, which is the CD payable to "Leport Walton or Lois Walton Henson." Bandy claims that he gave notice to the Bank of his interest in CD 12229 when on January 27, 1989, he demanded all of the remaining funds on deposit in Walton's checking accounts. He argues that the Bank converted CD 12229 when it paid Mrs. Henson on her endorsement of the CD in spite of Bandy's notice of his interest. We disagree.

A certificate of deposit is an "account" for the purposes of the Texas Probate Code. TEX.PROB.CODE § 436(1). CD 12229 was also a joint account for the purposes of the Texas Probate Code because it was payable on request to "one or more of two or more parties...." *Id.* § 436(4).

However, simply paying a surviving party to a joint account (whether or not that party has survivorship attributes) does not necessarily subject a financial institution to liability. The Probate Code states that "[a]ny sums in a joint account may be paid, on request, to any party without regard to whether any other party is incapacitated or deceased at the time payment is demanded." TEX.PROB.CODE § 445. Furthermore, "[p]ayment made as provided by Section ... 445 ... of this code discharges the financial institution from all claims for amounts so paid whether or not the payment is consistent with the beneficial ownership of the account as between parties...." *Id.* § 448. This discharge is not available to "payments made after a financial institution has received written notice from any party able to request present payment to the effect that withdrawals in accordance with the terms of the account should not be permitted.... No other notice or any other information shown to have been available to a financial institution shall affect its right to the protection provided here." *Id.*

The purpose of these provisions of the Probate Code appears to be to protect financial institutions from becoming involved in disputes between parties as to the beneficial ownership of joint accounts. This theme runs throughout the section of the Probate Code dealing with Multiple Party Accounts. *See* TEX.PROB.CODE § 444 (multiple-party account may be paid to any one or more of the parties; financial institution not required to determine source of funds before paying on account); *id.* § 446 (P.O.D. accounts payable to any original party to account); *id.* § 447 (trust accounts payable to any trustee or to beneficiary upon proof that beneficiary survived all trustees). However, the code makes it clear that even though financial institutions are protected from making payments that are not in accordance with the beneficial ownership of joint accounts, the rights of the parties between themselves remains intact. *Id.* § 448 ("The protection here provided shall have no bearing on the rights of parties in disputes between themselves or their successors concerning the beneficial ownership of funds in, or withdrawn from, multiple-party accounts").

The Bank's actions as related to CD 12229 satisfy this statutory protective scheme. First, Mrs. Henson was a party to the CD 12229. Therefore, the Bank was entitled to pay her without regard to Walton's death. TEX.PROB.CODE § 445.

Second, the Bank is discharged from all claims for the amount paid to Mrs. Henson out of CD 12229 because the Bank did not receive written notice from a party able to request present payment to the effect that withdrawals in accordance with the terms of CD 12229 should not be permitted. TEX.PROB.CODE § 448. Bandy argues that he, as a person able to request present payment, gave the appropriate notice to the Bank which should have preserved the Bank's liability.

However, Bandy's notice to the Bank was deficient. Bandy argues that his January 27 demand of all remaining funds in Walton's checking accounts and the Bank's subsequent receipt of the ex parte order allowing withdrawal of funds from the checking accounts met the notice requirements. However, there is no evidence in the record that either communication was sufficient. First, the January 27 demand was an oral communication. Only written notice will preserve a financial institution's liability. TEX.PROB.CODE § 448. Second, the ex parte order authorizing Bandy to withdraw funds from the checking account was issued on March 16, 1987, more than a month *after* the Bank paid Mrs. Henson on CD 12229. Finally, neither communication gave notice that withdrawals in accordance with CD 12229 should not be allowed. The code explicitly states that "no other notice or any other information shown to have been available to a financial institution shall affect its right to the protection provided here." TEX.PROB.CODE § 448. Consequently, Bandy's oral demand for the funds in Walton's checking account did not constitute the notice required to preserve the Bank's liability for disbursing funds out of CD 12229.

Accordingly, we hold that the Bank acted properly when it paid Mrs. Henson on CD

12229 and that the Bank neither converted nor setoff that CD.

## IV.

Bandy also challenges the court of appeals's holding that the Bank had a legal or equitable right to setoff the funds in the eight CDs and Walton's checking accounts against Walton's debts after his death. We have already determined that the Bank did not setoff the temporary administration CDs and CD 12229. Therefore, our discussion in this section of the opinion is limited to CDs 9355 and 10206 and Walton's checking accounts. CD 9355 was payable to "First State Bank and Walton." We cannot ascertain from the record who the payee was on CD 10206. The bank setoff these assets to pay what was due on three different notes all of which matured after Walton's death but before the right of setoff was exercised.

Bandy claims that the right of a bank to setoff a decedent's deposits against his debts is no longer viable in light of the Probate Code's claim requirements. Specifically, Bandy claims that the Bank should have submitted a claim to the estate and waited to be paid along with the other creditors rather than simply taking funds from Bandy's CDs. We disagree and hold that the Bank's right of setoff survived the enactment of the Texas Probate Code.

To reach this conclusion we will briefly review the claim procedures required by the Probate Code. We will then discuss the history of setoff and of setoff as it has been applied by banks to the deposits of deceased customers. Next, we will review the holdings in many jurisdictions that a bank's right to setoff the unmatured debts of a deceased customer's estate depends on the solvency or insolvency of the estate. Finally, we will hold that, in Texas, a bank will have the right to setoff unmatured debts of a deceased customer's estate whether or not the estate is insolvent.

Bandy argues that the Bank should be subject to the same claim[1] procedures as all other creditors of a decedent's estate. Bandy's administration is court-supervised and the notes the bank setoff were secured notes.[2] Consequently, the Bank would have first had to elect either to have his claims on these notes treated as "matured secured" claims or as "preferred debts and liens" against the notes' collateral. If the Bank did not make the prescribed election within the first six months of the estate administration, the claim would have been treated as a preferred debt and lien. TEX. PROB.CODE § 306(a)(1), (a)(2), (b); C. Boone Schwartzel, *The Priority of Creditors' Claims in Independent Administrations,* 42 BAYLOR L.REV. 291, 297 (1990). Had the Bank made the first election, its claims would have been classified as third-class claims with priority over all claims, to the extent of the value of the notes' collateral, except first- and second-class claims. Thus, the Bank would have been paid before any other creditors except for those creditors claiming funeral and last-illness expenses and the expenses of administering the estate. TEX.PROB.CODE § 322. Further, if the proceeds from the sale of the collateral had not paid off the notes the Bank could have collected the deficiency as an unsecured seventh-class creditor. *See id.; Schwartzel,* 42 BAYLOR L.REV. at 297.

Had the Bank elected to have its claims treated as preferred debts and liens, it would have had priority with respect to the notes' collateral over all other creditors including those claiming expenses associated with the decedent's funeral and last illness, and the estate administration. However by electing this status, the Bank would have forfeited any possibility of collecting a deficiency from the estate. TEX.PROB.CODE § 306(d); *Schwartzel,* 42 BAYLOR L.REV. at 298.

1. A claim is any liability of a decedent which survives his or her death. TEX.PROB.CODE § 3(c).

2. While there is nothing in the record to prove that Bandy's administration is a dependant one, in his brief Bandy claims it to be so and the Bank does not contest Bandy's assertion. We will, therefore, accept Bandy's statement as true. TEX.R.APP.P. 74(f).

Instead of choosing either of these alternatives, however, the Bank setoff the claims represented by the notes against Walton's CDs and checking accounts. By doing this, the Bank was able to completely satisfy Walton's debts on each of the three notes without having to wait in line behind other creditors and without having to suffer a loss due to a deficiency in the sale of collateral. Bandy does not argue that Walton's estate was not liable for the debt represented by the three notes. Instead, Bandy argues that the Bank's exercise of its right of setoff gave it an undeserved advantage over other creditors.

It is clear that a financial institution may exercise its right of setoff against the assets of a deceased's estate under the Probate Code. Indeed, the code is explicit about this right:

> Without qualifying any other statutory right to set-off or lien and subject to any contractual provision, if a party to a multiple-party account is indebted to a financial institution, *the financial institution has a right to set-off* against the account in which the party has or had immediately before his death a present right of withdrawal.

TEX.PROB.CODE § 449 (emphasis added). Therefore, the Bank in this case had some right to setoff Walton's assets. The only question is—what is the extent of that right?

The doctrine of setoff is ancient, having its roots in early bankruptcy law in England. THOMAS W. WATERMAN, LAW OF SET-OFF, RECOUPMENT AND COUNTERCLAIM 10 n. * (1869). The effect of setoff was to allow a defendant in a suit for a debt to raise a debt owed by the plaintiff to the defendant as a defense or counterclaim. If the setoff was allowed the amount that the plaintiff would recover from the defendant was reduced by the amount that the plaintiff owed the defen-

dant. *See Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528, 33 S.Ct. 806, 808, 57 L.Ed. 1313 (1913) (right of setoff "grounded on the absurdity of making A pay B when B owes A"); *Norris v. Commercial Bank*, 231 Ala. 204, 163 So. 798, 801 (1935) ("It is generally held that where parties have cross-demands against each other, the real indebtedness is the excess of one debt over the other"); *Sullivan v. Merchants' Nat'l Bank*, 108 Conn. 497, 144 A. 34, 34 (1928) (purpose of doctrine to prevent "circuity of actions"); 8 GEO. 2, ch. 24, § 4.[3] *See generally* Michael E. Tigar, Comment, *Automatic Extinction of Cross-demands:* Compensatio *from Rome to California*, 53 CAL.L.REV. 224 (1965) (tracing the history of setoff to Roman law). The doctrine has continuing vitality today. TEX.R.CIV.P. 97.

A bank's right of setoff is similarly ancient, stemming from the banker's lien of the law merchant. *Walter v. National City Bank*, 42 Ohio St.2d 524, 71 O.O.2d 513, 330 N.E.2d 425, 427 (1975). The theory behind the banker's lien is that a bank has a lien on all of a customer's property that is in the bank's possession for the amount due the bank from the customer in the ordinary course of business. The banker's lien has been widely accepted in other jurisdictions and has been recognized by at least one Texas court. *Citizen's Bank & Trust Co. v. Yantis*, 287 S.W. 505, 507 (Tex.Civ.App.—San Antonio 1926, no writ); Thomas G. Dobyns, Comment, *Banking Setoff: A Study in Commercial Obsolescence*, 23 HASTINGS L.J. 1585, 1586 (1972).

The bank's right in situations such as this is more appropriately called a setoff than a lien. A debtor/creditor relationship is created when a customer opens a general depository account with a bank.[4]

---

3. The statute, which was enacted in 1734, read: And whereas the Provision for setting mutual debts one against the other, is highly just and reasonable at all Times, be it therefore further enacted by the Authority aforesaid, That the said Clause in the said first recited Act, for setting mutual Debts one against the other, shall be and remain in full force for ever.

JOHN BASKETT, ANNO REGNI GEORGII II. REGIS MAGNA BRITANNIA, FRANCIA, & HIBERNIA, OCTAVO (1734).

4. A general account is one deposited without restrictions. The funds deposited become the property of the bank and a debtor/creditor relationship is created. "Banker's lien" is not an

Such a bank account constitutes a debt where the bank is the debtor and the customer is the creditor. *Van Winkle Gin & Machinery Co. v. Citizen's Bank*, 89 Tex. 147, 33 S.W. 862, 864 (Tex.1896); *Jeter v. Citizens Nat'l Bank*, 419 S.W.2d 916, 918 (Tex.Civ.App.—Eastland 1967, writ ref'd n.r.e.). When the customer also owes the bank money, such as through a promissory note, the bank is the creditor of the customer. It is this mutual debtor/creditor relationship, which occurs when a depositor also borrows money from the bank, that gives rise to the bank's right of setoff. *Van Winkle Gin & Machinery*, 33 S.W. at 864; *Jeter*, 419 S.W.2d at 918; *see also Bottrell v. American Bank*, 237 Mont. 1, 773 P.2d 694, 703 (1989); *Spratt v. Security Bank*, 654 P.2d 130, 135–36 (Wyo.1982); John TeSelle, *Banker's Right of Setoff—Banker Beware*, 34 OKLA.L.REV. 40, 42 (1981).

■ Before a bank can exercise its right of setoff the debt owed to the bank by the customer must be mature, that is, it must have come due. *Stockyards Nat'l Bank v. Presnall*, 109 Tex. 32, 194 S.W. 384, 385 (1917); *McCollum v. Parkdale State Bank*, 566 S.W.2d 670, 674 (Tex.Civ. App.—Corpus Christi 1978, no writ). The exception to this rule occurs when the customer is insolvent. *Stockyards Nat'l Bank*, 194 S.W. at 385. Were it not for this equity-based exception, the bank's debt might never be collected. *Id.*

■ If a bank has a right of setoff against a customer's deposit, that right survives the customer's death and continues against the decedent's personal representative. *Norris*, 163 So. at 801; *Traders' Nat'l Bank v. Cresson*, 75 Tex. 298, 12 S.W. 819, 820 (1889); *Smalley v. Trammel's Administrator*, 11 Tex. 10, 10 (1853); *Black v. Gray*, 280 S.W. 573, 574 (Tex. Comm'n App.1926, judgm't adopted); *cf. Mitchell v. Rucker*, 22 Tex. 66, 70 (1858)

(same rule applies when setoff is between individuals). This appears to be a general rule adopted in many jurisdictions. 10 AM. JUR.2D *Banks* § 671 at 643 (1963).

There is no general agreement among the jurisdictions around the country as to an issue that is important in this case: Does a bank's right of setoff against a deceased customer's deposit arise when the customer's debt to the bank matures *after* the customer's death? This situation creates a tension between two of the principles described above: (1) the bank's right of setoff survives the depositor's death; and (2) setoff may not be applied against a debt until it is mature unless the customer is insolvent. The former rule argues in favor of the bank's right to setoff a debt that matures after the customer's death; the latter rule argues the opposite.

The second rule also identifies the fulcrum upon which this controversy balances—the solvency or insolvency of the decedent's estate. There is little disagreement that a bank has no right to setoff a deceased customer's deposits to satisfy a debt that matures after the customer's death if the customer's estate is solvent. *See Bank of Guntersville v. Crayter*, 199 Ala. 599, 75 So. 7, 8–9 (1917); *Gardner v. First Nat'l Bank*, 10 Mont. 149, 25 P. 29, 30 (1890); *Jordan v. National Shoe & Leather Bank*, 74 N.Y. 467, 473–74 (1878); B.C. Ricketts, Annotation, *Bank's Right to Apply or Set Off Deposit Against Debt of Depositor Not Due at Time of His Death*, 7 A.L.R.3d 908, 909 (1966). The reasoning behind this rule is that it does no harm for the bank to follow the normal procedures associated with presenting claims to the estate because the debt owed the bank by a solvent estate will eventually be paid in full. *National Shoe & Leather Bank*, 74 N.Y. at 476.

appropriate description of this relationship because a bank cannot have a lien on its own property. *Kasparek v. Liberty Nat'l Bank*, 170 Okl. 207, 39 P.2d 127, 128 (1934).

A special account is created when a customer deposits funds for a specific purpose, as for example when a customer deposits funds in-

tended for the payment of bills. In that case the funds remain the property of the customer and a bailor/bailee relationship is created. *Hodgin v. People's Nat'l Bank*, 125 N.C. 503, 34 S.E. 709, 710 (1899); Tatum Turner, Note, *A Bank's Right to Setoff in Alabama*—Rainsville Bank v. Willingham, 39 ALA.L.REV. 245, 246–47 (1987).

The split occurs over whether a bank has the same right when the deceased customer's estate is insolvent. One line of authority upholds a bank's right to setoff a deceased customer's unmatured debt because the estate is insolvent while the other line of authority denies the right—but for the same reason. *Ricketts,* Annotation, 7 A.L.R.3d at 913.

The majority rule is that a bank may setoff a deceased customer's general deposits against the customer's unmatured debt if the estate is insolvent. *Norris v. Commercial Nat'l Bank,* 231 Ala. 204, 163 So. 798, 800 (1935); *American Surety Co. v. de Escalada,* 47 Ariz. 457, 56 P.2d 665, 666 (1936); *Ainsworth v. Bank of California,* 119 Cal. 470, 51 P. 952, 953 (1897); *Sullivan v. Merchants Nat'l Bank,* 108 Conn. 497, 144 A. 34, 35 (1928); *Reed v. Central Nat'l Bank,* 37 Del. 429, 184 A. 772, 776 (1936) (decided under statute); *First Nat'l Bank v. American Fletcher Nat'l Bank & Trust,* 480 N.E.2d 964, 968 (Ind.App.1985); *Ames Trust & Sav. Bank v. Reichardt,* 254 Iowa 1272, 121 N.W.2d 200, 203 (1963); *Little's Adm'r v. City Nat'l Bank,* 115 Ky. 629, 74 S.W. 699, 699 (1903); *Laighton v. Brookline Trust Co.,* 225 Mass. 458, 114 N.E. 671, 672 (1917); *Mathewson v. Strafford Bank,* 45 N.H. 104, 108–09 (1863) (decided under statute); *Camden Nat'l Bank v. Green,* 45 N.J.Eq. 546, 17 A. 689, 690–91 (1889), *aff'd,* 22 A. 56, 46 N.J.Eq. 607 (1890); *Hodgin v. People's Nat'l Bank,* 32 S.E. 887, 888 (N.C. 1899), *contrary result reached on reh'g on other grounds,* 125 N.C. 503, 34 S.E. 709 (1899) (account held to be a special account); *Kasparek,* 39 P.2d at 130 (positing that solvency of the estate should not be a factor); *Clarke v. Lincoln Trust Co.,* 50 R.I. 493, 149 A. 592, 592 (1930); *Conquest v. Broadway Nat'l Bank,* 134 Tenn. 17, 183 S.W. 160, 161 (1916); *Ford's Adm'r v.*

*Thorton,* 30 Va. (3 Leigh) 695, 698 (1832). The rationale for the majority view is that "insolvency renders all debts due, and furnishes, of itself, a sufficient ground for setoff." *Norris,* 163 So. at 800; *see also Sullivan,* 144 A. at 35; *Little's Adm'r,* 74 S.W. at 699.

The minority rule is that a bank does not have a right to setoff the deposits of a deceased customer against a debt that customer owed the bank even if the estate is insolvent. *Commercial Nat'l Bank v. Proctor,* 98 Ill. 558, 564 (1881) (dicta); *Horigan Realty Co. v. First Nat'l Bank,* 273 S.W. 772, 776 (Mo.App.1925); *Sharp v. Citizens' Bank,* 70 Neb. 758, 98 N.W. 50, 53 (1904); *Jaeger v. Bowery Bank,* 8 Misc. 150, 29 N.Y.S. 303, 304 (C.P. of New York City and County 1894); *Bosler's Adm'rs v. Exchange Bank,* 4 Pa. 32, 33 (1846). The rationale behind this view is that

to allow this set-off would be unfair to other creditors whose claims existed at the death of the decedent or matured before the [bank's]. Had the decedent lived, he might have drawn this deposit, and satisfied such prior creditors, or they might have reached it by judgment and execution.

*Jaeger,* 29 N.Y.S. at 304. One court answered this rationale:

The equity of the general creditor is in the balance remaining after the set-off. It does not begin until the set-off has taken place. The equity of the creditor of the insolvent is not only superior in time, but superior in merit, to that of the general creditors.

*Sullivan,* 144 A. at 36. The superior equity referred to by the *Sullivan* court lies in the assumption that the bank extended credit to the customer relying on the funds deposited as a form of security. *Bank of Guntersville,* 75 So. at 8.[5]

**5.** A similar situation arises in bankruptcy cases where the same competition occurs between creditors over the assets of the estate. In bankruptcy, the right of setoff is recognized. 11 U.S.C. § 553 (1988) (setoff allowed if performed before commencement of case even if within the 90–day preference period); *id.* § 506(a) (defining right of setoff as a secured claim to the extent of the deposits subject to setoff). Commentators have justified the existence of the right of setoff in bankruptcy situations as offering creditors a form of security. *See* Jack F. Williams, *Application of the Cash Collateral Paradigm to the Preservation of the Right to Setoff in Bankruptcy,* 7 BANKR.DEV.J. 27, 59 (1990) (right of setoff serves as a form of security in the bankruptcy context); *see also* John C. McCoid, II, *Setoff: Why Bankruptcy Priority?,* 75

Another rationale offered for the minority approach is:

[allowing a bank to setoff an unmatured debt against a decedent's deposits] would disturb the course of administration. At the death of the testator or intestate, the executor or administrator is the trustee for the creditors, whose right to the assets at that time becomes fixed and determined. Nothing that the executor or administrator can do can alter the course of distribution. If the estate be solvent, the creditors are entitled to receive their whole debt; if otherwise, they have a vested right to a *pro rata* dividend.

*Bosler's Adm'rs*, 4 Pa. at 33–34.

We have carefully reviewed the authorities cited and find ourselves in agreement with the majority rule. We cannot ignore the long common law tradition stretching back to early English common law and statutes. We also cannot ignore the fact that banks have relied upon the right of setoff under these circumstances for the same period of time. Dobyns, Comment, 23 HASTINGS L.J. at 1587 n. 14. Finally, we find that insolvency has long served as an exception to the rule in Texas that only matured debts may be setoff. *Stockyards Nat'l Bank*, 194 S.W. at 385. Therefore, we hold that a bank may setoff an unmatured debt owed the bank by a deceased customer against that customer's deposits if the deceased customer's estate is insolvent.

Were we satisfied with that holding alone, however, we would be creating a commercially untenable situation for banks and others hoping to exercise the right of setoff. The rule recited above is that if a deceased's estate is *insolvent*, the right of setoff exists. We have also noted the general rule that if the deceased's estate is *solvent*, the right of setoff does not exist. Thus, before a bank can safely exercise its right of setoff it must first determine whether or not the deceased's estate is solvent.

VA.L.REV. 15, 32, 36–37 (1989) (comparing right of setoff in bankruptcy to relational lien

However, the definition of "insolvent" in Texas is such that a party's insolvency cannot be determined without a court action or the action of the estate's administrator. Insolvency is defined, for the purposes of setoff, as "a debtor's failure or refusal to pay his debts in the due course of business." *McCollum*, 566 S.W.2d at 673; *see also Brooks v. American Nat'l Bank*, 103 S.W.2d 246, 250 (Tex. Civ. App.—Beaumont 1937, writ dism'd); *First Nat'l Bank v. Foley*, 26 S.W.2d 314, 318 (Tex.Civ.App.—Amarillo 1930, writ ref'd) (insolvent if incapable or refuse to pay debts). However, a debtor is not insolvent, as to a particular creditor, if the debtor "holds property against which the creditor may enforce a lien for the payment of the debt." *Smith v. Ojerholm*, 93 Tex. 35, 53 S.W. 341, 341 (1899) ("insolvency" has "widely different meanings"). If insolvency is to be the determinative factor upon which the right to setoff depends then we are setting traps for the unwary because the definitions and qualifications of insolvency are fraught with uncertainties. A bank seeking to setoff an estate's deposits would be foolish to depend on its own judgment as to whether the estate is solvent or not. Instead, it would have to wait until the estate is adjudged insolvent or until the administrator admitted the estate's insolvency. By that time, however, the estate's administrator would have had time to withdraw all of the deposits from the bank which would render the right of setoff moot.

We also note that the general rule that a bank may not setoff a deceased customer's deposits against the customer's debts if the estate is *solvent* appears to have been arrived at almost by a flip of a coin. For instance, one court stated: "The rule we maintain will not work hardship. If the estate of the decedent is solvent, the creditor has only to await distribution or bring his cross action." *National Shoe & Leather Bank*, 74 N.Y. at 476. We believe that allowing setoff when the estate is solvent will similarly "not work hardship" because

such as tax lien).

all of the estate's creditors will be paid in full even if the bank exercises its right of setoff.

Therefore, we hold that a bank's right to setoff an unmatured claim against a deceased customer's deposits exists whether or not the deceased's estate is solvent.[6] *See Kasparek*, 39 P.2d at 130 (adopted rule should work "no hardship or injustice whether the estate be solvent or insolvent"). Applying this rule to the facts of this case, we hold that the Bank acted within its rights when it setoff CDs 9355 and 10206 and Walton's checking accounts to the extent of Walton's beneficial ownership of those assets.

The beneficial ownership of CD 9355 is clear. The record contains a copy of CD 9355 which indicates that it was payable to "First State Bank and Leport Walton." Therefore, some share of the beneficial ownership of CD 9355 resided in the Bank and a complementary share was held by Walton before his death. We do not need to determine the relative size of the two shares; it is enough that only the Bank and Walton had any beneficial ownership of CD 9355. Since no third party held a beneficial ownership of CD 9355, the Bank was entitled to setoff the entire amount. TEX. PROB.CODE § 439.

The record is not sufficient for us to make the same kind of determination with respect to CD 10206 and Walton's checking accounts. The record does not contain copies of the CD or the signature cards associated with the checking accounts. Therefore, we cannot determine if the checking accounts are joint accounts or even if they are general rather than specific accounts. We also cannot determine whether CD 10206 is a joint account and Walton's beneficial ownership of that account. Consequently, we cannot determine the amount of each of these assets that the Bank was entitled to offset.

Bandy brought this suit claiming that the Bank had converted the eight CDs and Walton's checking accounts. To recover, Bandy had the burden of proving each of the elements of his cause of action by a preponderance of the evidence. *See Great Am. Ins. Co. v. Langdeau*, 379 S.W.2d 62, 70–71 (Tex.1964). Conversion is defined as "the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights." *Tripp Village Joint Venture v. MBank Lincoln Centre, N.A.*, 774 S.W.2d 746, 750 (Tex.App.—Dallas 1989, writ denied). Therefore, Bandy had the burden of proving that the Bank wrongfully exercised dominion and control over at least some portion of CD 10206 and Walton's checking accounts. As we have seen, this can only be proved in this case by demonstrating that those assets were joint accounts. Bandy failed to provide any such evidence. Therefore, we hold that Bandy did not prove that the Bank converted CDs 9355 and 10206 and Walton's checking accounts. In the absence of that proof, we further hold that the Bank acted properly in exercising its right of setoff against those assets.

Because we find that the Bank neither converted nor wrongfully setoff any of Leport Walton's estate's assets, we need not reach the issues surrounding Bandy's distress sale of the grocery store.

## V.

For the foregoing reasons, we affirm the court of appeals' judgment, remanding this cause for a new trial. We further order that Walton's estate should pay all costs in this court and in the court of appeals.

Dissenting opinion by GAMMAGE, J., joined by MAUZY and DOGGETT, JJ.

GAMMAGE, Justice, dissenting.

I respectfully dissent. The court adopts a substantive rule favoring banks to the great detriment of decedents' estates. Part IV of the court's opinion states its "agreement with the majority rule," but then adopts the minority rule that a bank

---

6. We do not decide, because the issue is not presented here, the authority of a court to order a bank to release funds to satisfy the statutory preferences described in TEX.PROB.CODE § 290 (family allowance), where such preferences would conflict with the right of setoff.

may offset a deceased customer's accounts against *unmatured* debts even though the decedent's estate is solvent. The court reaches this conclusion out of concern for the bank's ability to know whether the estate is insolvent, thereby apparently abandoning the rule that the burden of proof for insolvency is on the bank claiming the exception to justify the offset. The court expresses concern for the bank in the face of express trial court findings that this bank's offset against the decedent's accounts disrupted the orderly administration of the estate and forced a "fire sale" of one of the estate's principal assets.

The administrator has a fiduciary duty to preserve the assets of the estate. The bank defeated the administrator's efforts to preserve the estate by destroying the estate's liquidity. The majority rule which Texas has heretofore recognized is designed to preserve the liquidity of estates by allowing offset of unmatured debts *only* if the estate is insolvent. This case demonstrates the wisdom of that rule. I therefore dissent from the court's opinion and judgment.

I first address where Texas law was before the court's opinion in this case. Texas early recognized a bank's right of offset independent of the claims procedure for the probate code then in effect. The probate code then required presentment of the claim to the personal representative. In *Smalley v. Trammel's Admr.*, 11 Tex. 10 (1853), this court held that one may setoff an unpresented claim to defeat the claim asserted by the estate. In *Mitchell v. Rucker*, 22 Tex. 66 (1858), this court clarified that a bank's unpresented claims could offset only to the extent of the estate's claim to assets held by the bank. If the offset against a bank-held asset left a net amount due from the estate on the bank's claim, it was not collectible because it had not been presented. In other words, on the bank's claim, the set-off principle recognized for unpresented claims was purely defensive in nature. Moreover, it applied only to *matured* debts, those that had become due.

In *Traders' Nat'l Bank v. Cresson*, 75 Tex. 298, 12 S.W. 819 (1889), the court likewise held that a debt matured at the time of death could be asserted defensively against a claim by an administrator, although it had not been presented in the probate court. The opinion states:

> The court erred in ruling that the bank could not assert the defense of set-off against the plaintiff's demand, but was required to assert its claim in the county court. The debt pleaded in set-off appears from the answer to have been due from the appellee's intestate, at the time of his death, to the appellant, and having, therefore, been contracted in the intestate's life-time, it extinguished, as far as it went, the claim sued on; and, to the extent it so extinguished the claim sued on by the administrator, the defendant below was entitled to plead it in set-off. [*Smalley; Mitchell.*]

*Cresson*, 12 S.W. at 820.

The other Texas cases do not, strictly speaking, deal with probate offsets. *Stockyards National Bank v. Presnall*, 109 Tex. 32, 194 S.W. 384 (1917), was a garnishment case. A judgment creditor garnished a bank which had an account of the judgment defendant. The bank claimed it could offset two unmatured promissory notes against the amount in the judgment debtor's account because he was a non-resident. This court wrote:

> No contention is made that he was insolvent. We decline to hold that the mere fact of his non-residence entitled the bank to offset the deposit against the unmatured notes and thus destroy the effect of the garnishment. *It is a primary rule that a debt must have matured to be available as a set-off.* An exception is made where the debtor is insolvent. No such equitable consideration is presented here by the mere non-residence of the debtor.

*Stockyards*, 194 S.W. at 385 (emphasis added).

The *Stockyards* case is instructive in three ways. First, the burden of proof is on the bank to raise and prove the insolvency exception to the rule that an unmatured

debt may not be offset. Second, an unmatured debt may not in general be set off. Third, if the debtor is insolvent, an unmatured debt may be offset against the balance owed the debtor.

If Texas law on solvent or insolvent estates is generally to follow its law for solvent or insolvent living debtors, as cases from other jurisdictions have suggested is proper,[1] then the burden to prove insolvency is on the bank.[2] Further, Texas would follow the majority rule that a bank, or similar financial institution, could not offset an unmatured note against the accounts of the decedent. The court's opinion concedes the majority rule is "no offset against unmatured debts for solvent estates". I would go further and observe that, among jurisdictions that allow offset of unmatured notes for insolvency, the no-offset rule for unmatured debts is generally followed. *See e.g. Citizens' Bank & Trust Co. v. Turner,* 23 Ala.App. 23, 122 So. 311, 312, *cert. denied,* 219 Ala. 366, 122 So. 312 (1912); *Sullivan v. Merchants Nat'l Bank,* 108 Conn. 497, 144 A. 34, 35 (1928); *Gardner v. First Nat'l Bank,* 10 Mont. 149, 25 P. 29 (1890); *Jones v. Jones,* 21 N.H. 219, 222–23 (1850); *Polkowitz v. Goldberger,* 9 N.J.Misc. 880, 156 A. 1, 1–2 (1931); *Armstrong v. Pratt,* 2 Wis. 299, 307 (1853). It is clear that following this majority rule is most consistent with our Texas cases.

It is true that two opinions not issued by this court may be misinterpreted to allow a broader offset. *Jeter v. Citizens Nat'l Bank,* 419 S.W.2d 916, 918 (Tex.Civ.App.— Eastland 1967, writ ref'd n.r.e.), dealt with the contractual right of offset (from the decedent and subsequently the executor), although it quotes language from a Minnesota case [3] which suggests a broader right to offset, but which in fact addresses the

contractual right of offset. Likewise, *Black v. Gray,* 280 S.W. 573, 574 (Tex. Comm'n App.1926, judgm't adopted), contains dicta that a broader right of offset exists as to unmatured debts absent the insolvency exception; but that case involved the offset of a note "duly declared matured under an accelerating clause" and the offset occurred before the death of the depositor. These cases do not mean that Texas did not follow the majority rule, and the court's opinion does not suggest otherwise, but purports instead to decide an open question.

What are the reasons the court's opinion gives for adopting a minority rule? First it tells us that insolvency has different definitions and it is hard for a bank to know which one to use. Then it suggests it is unfair for a bank to have to "guess" whether its deceased customer is solvent, assuming it knows which definition to use. Finally it tells us that "no harm" is done to a solvent estate if the offset is allowed for unmatured debts because, after all, the estate is solvent. I will address these arguments in order.

For purposes of probate proceedings (administration), the correct standard is balance-sheet solvency. The probate code may set aside certain exempt property or allowances, or both, and expenses of administration may add some uncertainty to the ultimate equation, but basically administrations exist to pay the unsecured creditors and see that debts are paid. The nonexempt assets will go to pay creditors. The bottom line of the assets affects all creditors, and the administrator has a fiduciary duty to maximize those assets. The majority rule is that balance-sheet insolvency is the standard for allowing the offset of unmatured debts against a decedent's estate, with the burden of proof on the party

---

1. *See, e.g., Little's Adm'r v. City Nat'l Bank,* 115 Ky. 629, 74 S.W. 699, 699 (1903); *Laighton v. Brookline Trust Co.,* 225 Mass. 458, 114 N.E. 671, 672 (1917); *Troup v. Mechanics' Nat'l Bank,* 24 R.I. 377, 53 A. 122, 124 (1902).

2. The burden is apparently normally placed on the financial institution claiming the insolvency exception. *See, e.g., Gilmartin v. Osborne Trust Co.,* 266 App.Div. 1022, 44 N.Y.S.2d 938, 939

(1943), *aff'd,* 292 N.Y. 629, 55 N.E.2d 505 (1944) (defendant trust company's summary judgment evidence failed to show decedent was insolvent or had perpetrated a fraud in connection with note that did not become due until after his death).

3. *Browning v. Eiken,* 189 Minn. 375, 249 N.W. 573 (1933).

claiming the offset. *Thomas v. National Bank,* 16 N.J.Misc. 271, 198 A. 539, 543 (1938). The court errs in confusing cash-flow insolvency, and related concepts, with insolvency for an estate.

Second, a bank's difficulty determining whether an estate is insolvent is certainly no greater than anyone else's. In fact, the financial institution's experience dealing with balance sheets, loan qualification data and other accounting information should give it a substantial advantage over others, possibly over the administrator or executor as well. Difficulty of proof has not kept most states from adopting the majority rule, out of fairness to others interested in the estate.

Finally, the argument that offset will not hurt a solvent estate is the simplistic and, I believe, erroneous analysis apparently made jurisdictions [4] adopting the minority rule. It assumes that all assets of the estate are converted to cash instantaneously and that the bank with a deposit to

offset harms no one by taking its debt as cash. That ignores liquidity and cash-flow problems. Walton's estate exhibited both problems. Walton had several businesses. His administrator needed to keep the businesses going because, among other reasons, an on-going business will normally bring a higher price than a defunct one. Walton's estate included real property. Real property is not a liquid asset. Denying the estate the cash represented by the bank deposits and CDs placed a cash-flow squeeze on the administrator's efforts. When real property is sold under distress sale conditions, it simply does not bring its market value, and all the other creditors as well as the heirs of the estate are harmed. Although in a slightly different context, one court has explained this liquidity problem in these terms:

> It would make the conduct of business hazardous if the bank, which was the holder of unmatured discounted notes, could at its option take over the deposits of its customers in payment of claims not

---

**4.** Determining which jurisdictions allow offset of an unmatured debt against an account passing to a solvent estate, is itself a problem. The leading case advocating that view appears to be *Ainsworth v. Bank of California,* 119 Cal. 470, 51 P. 952, 954 (1897), in which there was no finding or evidence on the solvency of the estate and the court wrote that "if the estate be solvent, . . . no harm can come by applying the rule." The only way to allow offset without knowing whether the estate is solvent is to allow offset against solvent estates as well. Nevertheless, in *Pendleton v. Hellman Commercial Trust & Sav. Bank,* 58 Cal.App. 448, 208 P. 702, 704 (1922), the lower California court required the bank to show insolvency and wrote, "It is not to be denied that under ordinary conditions, where the debt to the bank is not due, the banker's right to set-off a deposit against such debt does not exist."

Oklahoma apparently follows the rule, because the *Ainsworth* language is quoted with approval in *Kasparek v. Liberty Nat'l Bank,* 170 Okl. 207, 39 P.2d 127, 130 (1934), although in *Kasparek* the record clearly showed the estate was insolvent.

In *Convery v. Langdon,* 66 Ind. 311 (1879), the court held that the state's probate code language of "cross demands," required that unmatured debts be offset. 66 Ind. at 313. The court nevertheless went on to write that it would hold the right existed at common law and that solvency or insolvency had no bearing to the right to offset the unmatured debt. *Id.* at 315–16.

Later, under a perhaps more modern probate code, an intermediate appellate court wrote that the decedent was insolvent at the time of his death and that his estate was probably insolvent. *First Nat'l Bank v. American Fletcher Nat'l Bank & Trust,* 480 N.E.2d 964, 968 (Ind.App. 1985). Perhaps Indiana follows the minority rule.

Kentucky also presents an interesting question. In *Little's Adm'r v. City National Bank,* 115 Ky. 629, 74 S.W. 699 (1903), a note matured the day after decedent died. The court quoted the rule that if the estate is insolvent, then the offset is allowed. The court does not say the estate involved was insolvent. Rather it states that the offset is allowed "for its debt had matured before there was an administration on the estate of the decedent, or any demand made of it for the deposit." 74 S.W. at 699. The court then quoted with approval some language from *Bosler's Administrators v. Exchange Bank,* 4 Pa. 32, 33–34 (1846), to the effect that in a solvent estate the bank is entitled to its whole debt and no harm to other claimants would occur from an offset. Pennsylvania is one of the minority jurisdictions that does not allow offset of unmatured debts for insolvency. *Little's* has been interpreted to mean Kentucky follows the minority rule allowing offset for unmatured debts, but in *Ohio Valley Nat'l Bank v. Edwards,* 492 S.W.2d 195 (1973) (involving an insolvent estate), the court's opinion points out that the parties agreed that under Kentucky law an unmatured debt could be offset even though the estate was solvent.

**626**

due upon learning of possible [cash-flow] insolvency, thus withdrawing the working capital with which the debtor was conducting his business.

*Kurtz v. County Nat'l Bank,* 288 Pa. 472, 136 A. 789, 790 (1927).

The correct rule of "no harm" for a solvent decedent's estate is to allow all parties with unmatured debts to file their claims with the probate proceedings:

> The rule we maintain will not work hardship. If the estate of a decedent is solvent, the creditor has only to await distribution or bring his cross action. If there are any circumstances existing which render it inequitable to deny him a set-off, he may set them up in the action on the demand against himself and invoke the equity power of the court.

*Jordan v. Nat'l Shoe & Leather Bank,* 74 N.Y. 467, 476 (1878).

The court errs in adopting a minority rule that will disrupt the orderly administration of many estates, to protect banks in the area where they already have the most expertise. The court should require the financial institution to plead and prove insolvency of the estate to entitle it to an offset.

MAUZY and DOGGETT, JJ., join in this dissent.

