COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                                 NO.
2-05-380-CV

 

 

ESTATE OF CARRIE MAE
GLENN, DECEASED

 

                                                       ------------

 

                   FROM PROBATE COURT NO. 2 OF TARRANT COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

 

                                                       ------------

 








Appellants William and Paula Glenn appeal from a jury
verdict that they conspired to convert and William did convert three checks
from Carrie Mae Glenn.  In five issues on
appeal, William and Paula argue that (1) the evidence is legally insufficient
to support the jury=s verdict, (2) the evidence is factually
insufficient to support the jury=s verdict, (3) the
trial court applied the wrong burden of proof, (4) the trial court erred by
excluding certain evidence, and (5) the trial court erred by concluding that
the issue of Carrie=s mental capacity was tried by consent
and, as a result, the trial court improperly gave Appellee administratrix Lisa H.
Jamieson leave to amend her pleadings during trial.  Because we hold that the evidence presented
at trial was legally and factually sufficient, that the trial court did not err
in its allocation of the burden of proof, that the trial court did not abuse
its discretion by excluding the testimony of Vicky Meyer, and that the error,
if any, in allowing the administratrix to amend her pleadings was harmless, we
affirm.

Facts

Three checks, all payable to Carrie, are at issue in the
instant suit:  a $33,871.40 cashier=s check from First
Union Bank (Acheck one@); a $80,000
cashier=s check from
Region=s Bank (Acheck two@); and a
$57,017.49 check (Acheck three@), the proceeds
from the sale of Carrie=s house. 
The events relating to the cashing of these three checks are relevant to
the jury=s findings that
Carrie did not make a gift of any of these checks to William or Paula, and that
William and Paula conspired to convert and William did convert the proceeds of
these checks.








Carrie died on February 26, 2002, at the age of ninety-seven.  Her will named William as executor of her
estate.  William=s wife Paula was
not named in the will.  Carrie had no
children of her own but had raised William=s father, and
William and his siblings referred to her as AAunt Carrie@ and considered
her a grandmother.  In 1998, Carrie=s will contained
specific bequests of money totaling more than $254,000.00 to William, his
siblings, and others.

In 2000, at Carrie=s request, William
moved Carrie from her home in Augusta, Georgia, to his home in Colleyville,
Texas.  He later moved her to a nursing
home when he felt he could no longer adequately care for her.

Before leaving Georgia, William took Carrie to First Union
Bank, one of her two banks, where he helped her close her account and obtain
check one.  They also made arrangements with
Carrie=s other bank,
Regions Bank, for the remainder of her money ($80,000.00) to be sent to William=s home in the form
of a cashier=s check (check two).








On August 15, 2000, shortly after returning to Texas with
her, William took Carrie to his Fort Worth bank, OmniAmerican Credit Union,
where William opened a certificate of deposit (ACD@) in his name,
funded with check one (ACD 1@).  Carrie was not made a beneficiary of this
CD.  The parties dispute whether this
account was or should have been jointly owned by William and Carrie.  The application form filled out to open the
CD, which William signed, identified Carrie as William=s mother and noted
that the CD was to be issued in their joint names.  The OmniAmerican employee who opened the CD
for William and Carrie testified by deposition that the CD was issued in both
names at Carrie=s request. 
William claimed at trial that Carrie had given him the check, but that
the bank employee used Aan improper form,@ and that Carrie
owned no part of the CD.  The physical
certificate mailed to William=s home lists his
name only.  The bank records introduced
at trial do not explain why, if the application form listed joint owners, the
CD ultimately listed only William=s name.

Next, check two arrived at William=s house, and on
August 29, 2000, William returned to OmniAmerican, where William used the check
to purchase in his name a $70,000.00 CD (ACD 2@).  This CD lists Carrie as a beneficiary but not
as a joint owner.  The remaining
$10,000.00 from check two was converted into a cashier=s check by
OmniAmerican and deposited into a joint checking account in William and Carrie=s names at a
Colleyville branch of Chase Bank.

William and Paula discussed the removal of Carrie from the
two CDs at OmniAmerican, and on October 4, 2000, Carrie was removed from all
accounts at OmniAmerican, and Paula was added as a beneficiary on all
accounts.  William and Paula both signed
the necessary form, and they testified at trial that Carrie also signed the
form.  Jamieson, however, introduced
copies of Carrie=s signature on other documents and raised
the question of whether Paula had forged Carrie=s signature on the
form.








Carrie=s house in Georgia
sold in 2001, and she received check three, which contained the proceeds from
the sale.  On April 6, 2001, William
deposited the check in the Chase account. 
In his deposition before trial, William stated that he and Carrie
jointly owned the funds in the Chase account, but at trial he testified that
Carrie gave him the check as a gift, and he denied that Carrie owned any part
of the Chase joint account except the retirement benefits from her deceased
husband that were automatically deposited in the account each month.

In September 2001, CD 1 and CD 2 matured, and William
rolled them into one $100,000 CD (ACD 3@).  Paula was made a joint owner.  Carrie was not made a joint owner or
beneficiary.  William testified at trial
that he was Areasonably certain@ that the surplus
above $100,000 from CD 1 and CD 2 was deposited in another account William had
at OmniAmerican.

At some point before Carrie=s death, William
withdrew $30,000 from the Chase joint account and opened yet another CD (ACD 4@).  Carrie was not made a joint owner or beneficiary
of CD 4.








Carried died in February 2002.  William testified that at the time of Carrie=s death the Chase
joint account had a balance of approximately $15,000.00, and that shortly after
her death he closed the account and destroyed the bank records relating to
it.  He had previously used funds from
the Chase account to open a $100,000 annuity. 
William could not say definitively what he did with the $15,000 but said
he was Asure@ that he either
moved the money into another account he had with Chase or added it to the
annuity.

When CD 3 matured, William used the funds to open a
$200,000 annuity.  At some point, William
learned that he was the beneficiary of a $300,000 annuity purchased by Carrie
before she moved to Texas.  At trial
there was some dispute about whether William knew about the annuity before
Carrie died or only found out about it after her death.  William claimed at trial that throughout all
of the events described, Carrie told William and Paula that she was giving
William the money from the three checks.








After Carrie=s death, William
presented her will for probate.  At that
time, her estate did not have enough money to pay the bequests in the
will.  William=s siblings, Martha
Dillehay, Jean Woodard, and John Robert Glenn, contested William=s appointment as
executor, alleging among other things that he had wrongfully taken assets from
Carrie=s estate.  After a hearing, the trial court appointed
Lisa H. Jamieson as the administratrix. 
She then brought the present suit against William and Paula, alleging
that they had conspired to convert and that William did convert $170,888.89 of
Carrie=s money prior to
her death.  After a jury trial, the trial
court entered a final judgment for Jamieson for $171,000, plus $20,295.12
prejudgment interest.  The judgment was
against William and Paula jointly and severally, and they filed a timely notice
of appeal.

Analysis

Legal and Factual Sufficiency

In their first and second issues, William and Paula argue
that there is no evidence to support the jury=s verdict on
conspiracy, gift, and conversion, and that there is insufficient evidence to
support the jury=s verdict on conversion. 








A legal sufficiency challenge may only be sustained
when:  (1) the record discloses a
complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact; (3) the evidence offered to prove a vital fact is no more than a
mere scintilla; or (4) the evidence establishes conclusively the opposite of a
vital fact.[2]  In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable factfinder could, and
disregard evidence contrary to the finding unless a reasonable factfinder could
not.[3]  Anything more than a scintilla of evidence is
legally sufficient to support the finding.[4]  More than a scintilla of evidence exists if
the evidence furnishes some reasonable basis for differing conclusions by
reasonable minds about the existence of a vital fact.[5]

An assertion that the evidence is factually insufficient to
support a fact finding means that the evidence supporting the finding is so
weak or the evidence to the contrary is so overwhelming that the answer should
be set aside and a new trial ordered.[6]  We are required to consider all of the
evidence in the case in making this determination, not just the evidence that
supports the finding.[7]








The jury charge defined conversion as Athe unauthorized
and unlawful assumption and exercise of dominion and control over the personal
property of another to the exclusion of, or inconsistent with, the owner=s rights.@  The jury was instructed that to succeed on a
conversion claim, a plaintiff has to show Atitle, right to
possession, and a demand for return of the property unless the possessor's acts
manifest a clear repudiation of the plaintiff's rights.@  The only disputed question at trial with
respect to the conversion elements was whether William had exercised dominion
and control over the property in question to the exclusion of or inconsistent
with Carrie=s rights, as Jamieson contends, or whether
Carrie had given the property to William as a gift.








Jamieson=s witnesses
testified that Carrie had trouble seeing without a magnifying glass and that
even with a magnifying glass, she had trouble reading documents.  The evidence also showed that Carrie
sometimes had difficulty recognizing people. 
Witness testimony also suggested that Carrie was on good terms with the
rest of William=s family and that she wanted some of her
property to go to them.  Another witness
testified that Paula told her that Carrie had Alzheimers, raising a question at
least as to whether Paula could believe that Carrie was competent to make a
gift of her property.  Janice Austin, a
friend of Carrie and her neighbor in Georgia, testified by deposition that
while Carrie still lived in Georgia, she had helped Carrie write out her bills
and reviewed her bank statements for her for several years because Carrie could
not see well enough to write her own checks or review documents.  She further testified that Carrie was
reluctant to give away property before her death and that she had never known
Carrie to give money or property to another person.

Jamieson also presented evidence specific to each
check.  Deposition testimony of Alison
Crowder, the OmniAmerican employee who opened CD 1, stated that Carrie had said
this CD should be jointly owned by her and William and that the CD was so
issued.  William signed the application
form stating the account should be joint with Carrie.  The testimony at trial did not definitively
establish why the certificate ultimately mailed to William was in William=s name alone.  When the CD matured, William used the funds
to open CD 3 in his and Paula=s names; Carrie
was not listed even as a beneficiary.

With respect to the second check, William testified that he
took most of the funds and opened a CD in his name and listed Carrie as a
beneficiary, but he later removed her from the account.  When the CD matured, he used its proceeds
along with the proceeds from CD 1 to open CD 3.








William testified that he saw Carrie sign the first page of
the authorization form removing her as beneficiary from the second OmniAmerican
CD, but Jamieson contended at trial that the AGlenn@ in Carrie=s alleged
signature appears identical to that in Paula=s signature on the
same page.  She introduced copies of
documents signed by Carrie near the time that Carrie allegedly signed the
authorization form, and the jury could have properly concluded that Carrie did
not sign the authorization form.








William testified that he took $10,000 from check two and
deposited it in the joint checking account at Chase.  Check three was also deposited in this
account.  William destroyed the bank
records for this account after Carrie died, and he refused to obtain copies of
these records from the bank even when Jamieson served him with a request for
production.  He testified that he
considered the Chase account his personal account, and that although the
account was set up as a joint account, Carrie did not have a debit card for the
account and he had exclusive possession of the checkbook for the account.
William further testified that shortly after Carrie died, he moved the funds in
the Chase account, approximately $15,000, either into his own account or into
the annuity he purchased with other funds from the Chase account.  At his deposition, William acknowledged that
Carrie Aabsolutely@ jointly owned the
Chase account but then at trial changed his testimony to say that the only
funds in the Chase account that she owned were her railroad retirement benefits.  Before Carrie died, he took $30,000 from the
Chase account and bought a CD for which Carrie was not listed as joint owner or
beneficiary.          This evidence
presented at trial is enough to furnish some reasonable basis for differing
conclusions by reasonable minds about whether William exercised dominion and
control over Carrie=s property to the exclusion of or
inconsistent with Carrie=s rights. 
We therefore hold that the evidence presented by Jamieson is legally
sufficient to support the jury=s verdict on
conversion.  We further hold that the
evidence presented at trial was factually sufficient to support the jury=s verdict of
conversion because we cannot say that the evidence supporting the conversion
verdict is so weak or that the evidence to the contrary is so overwhelming that
the verdict should be set aside.








William and Paula argue that,
assuming William had to show a gift by clear and convincing evidence, he met
this burden because the only evidence before the jury with respect to the three
checks was that the checks were completed gifts to William.  The jury was instructed that in order to find
a valid gift by a person during the person=s lifetime,Ait must be
shown that the donor clearly intended to make such gift, and that there was a
present delivery of the property of such character as to divest the donor of
the title, dominion, and control over it.@  The jury answered Ano@ to the
question of whether it found, by clear and convincing evidence, that Carrie had
made a gift to William of the three checks in question, meaning that William and
Paula failed to carry their burden of proof on this issue.[8]

Clear and convincing evidence
is that measure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.[9]  This intermediate standard falls between the
preponderance standard of civil proceedings and the reasonable doubt standard
of criminal proceedings.[10]  While the proof must weigh heavier than
merely the greater weight of the credible evidence, there is no requirement
that the evidence be unequivocal or undisputed.[11]








This higher burden of proof
elevates the appellate standard of legal sufficiency review of evidence
supporting a finding that must be proved by clear and convincing evidence.[12]  When a party challenges on legal sufficiency
grounds a finding for the party who had the burden of proof on the issue, we
must determine whether the evidence is such that a factfinder could reasonably
form a firm belief or conviction that its finding was true.[13]
 When the party challenges an
adverse finding on an issue for which that party had the burden of proof, the
party Amust demonstrate on appeal that the evidence establishes, as a matter
of law, all vital facts in support of the issue.@[14]  We must first review the
record for evidence supporting the finding, Awhile ignoring all evidence to the contrary,@[15] and if no evidence supports the finding, we must then look at the
entire record Ato determine
if the contrary proposition is established as a matter of law.@[16]








We must review all the
evidence in the light most favorable to the finding.[17]  This means that we must assume that the
factfinder resolved any disputed facts in favor of its finding if a reasonable
factfinder could have done so.[18]  We must also disregard all evidence that a
reasonable factfinder could have disbelieved.[19]  We must consider, however, undisputed
evidence even if it is contrary to the finding.[20]  That is, we must consider evidence favorable
to the finding if a reasonable factfinder could, and disregard evidence
contrary to the finding unless a reasonable factfinder could not.[21]








William and Paula contend
that the only evidence in the record about the transactions involving these
three checks is that they were completed gifts to William.  We disagree. 
With respect to check one, Alison Crowder testified that Carrie wanted
the CD to be jointly owned by Carrie and William.  As to check three, William admitted in his
deposition testimony that the funds in the Chase account, which were made up in
part by check three, were jointly owned by him and Carrie, although he
contradicted this statement at trial. 
With respect to check two, there is no direct evidence that Carrie did
not give this check to William, but there was some evidence that Carrie would
not have made an inter vivos gift of her money.  Further, William=s and Paula=s testimony
that Carrie gave the check to William was not Aclear, positive, direct, otherwise credible, [and] free from
contradictions and inconsistencies.@[22]  During the proceedings both
William and Paula contradicted their earlier deposition testimony, and they
repeatedly gave vague, evasive, or non-responsive answers to the opposing
counsel=s questions.  The jury properly
could have found their testimony not credible. 

Because Jamieson presented
evidence that the jury could have credited that Carrie did not make a gift of
the checks to William, and the jury properly could have found that William and
Paula=s testimony was not credible, we cannot say that the evidence
establishes, as a matter of law, all vital facts in support of William and
Paula=s claim.[23]  Accordingly, we hold that the evidence is
legally sufficient to support the jury=s findings on this issue.








William and Paula also argue that there is no evidence to
support the jury=s finding that Paula conspired with
William to convert Carrie=s property.  The jury was instructed that for William and
Paula to be a part of a conspiracy, they Amust have
knowledge of, agree to, and intended a common objective or course of action
that resulted in damages to Carrie.@  The jury was further instructed that one or
both of them must have performed some act in furtherance of the conspiracy.

In her testimony, Paula stated that William Adiscusses [with
her] almost anything of significance in [their] marriage,@ and William
testified that he discussed with Paula removing Carrie as beneficiary on all
OmniAmerican accounts and adding Paula as beneficiary on all accounts.  Paula further testified that she signed the
form that added herself as beneficiary on all OmniAmerican accounts, and she
admitted that she knew the same form would remove Carrie from the
accounts.  Jamieson offered exhibits that
raised a question of whether Paula had forged Carrie=s signature on the
same form.  Paula also became a joint
owner on CD 3 while Carrie was still alive.

The evidence presented at trial is legally sufficient to
furnish some reasonable basis for differing conclusions by reasonable minds
about whether Paula knew of, agreed to, and intended a course of action with
William that resulted in damages to Carrie. 
We have previously held that the evidence is sufficient to support a
finding that William converted Carrie=s property,
satisfying the requirement of an act in furtherance of the conspiracy.  We therefore hold that the evidence is
legally sufficient to support the jury=s verdict on
conspiracy.








Because we hold that the evidence is legally sufficient to
support the jury=s verdict on gift, conspiracy, and
conversion, and factually sufficient to support the jury=s verdict on
conversion, we overrule William and Paula=s first and second
issues.

Burden of Proof

In their third issue, William and Paula argue that the
trial court placed an improper burden on both parties at trial.  They first argue that Jamieson should have
been required to show both Carrie=s lack of donative
intent and conversion by them by Aclear and
convincing evidence.@ 
The proper burden of proof for a claim of conversion is preponderance of
the evidence,[24]
and Jamieson would have had to show lack of donative intent only if she wanted
to rebut a presumption of gift.[25]  Because, as we hold below, William and Paula
were not entitled to a presumption of gift, Jamieson had no such burden at
trial.  The trial court therefore placed
the proper burden on Jamieson.













William and Paula next argue that the trial court erred by
requiring them to prove a gift by Aclear and
convincing evidence@ and by not instructing the jury on
presumption of gift.  A party claiming a
gift has the burden to prove the gift by Aclear and
convincing evidence.@[26]  Further, in their motion for directed
verdict, William and Paula=s attorney stated,
AAs I understand
the law, the burden then shifts to my clients to prove by clear and
convincing evidence, evidence that is free from contradiction and is
uncontroverted, that they meet the three elements the Texas courts have
recognized [for proving a gift].@ [Emphasis
added]  In William and Paula=s proposed charge,
they requested an instruction that in order for William to establish the
property was a gift, he needed to establish the three elements Aby >clear and
convincing evidence.=@[27] The only
objection that William and Paula made with respect to the question containing
the instruction on burden of proof was that the gift and conversion issues
should be submitted together to prevent inconsistent answers, and their
attorney suggested that the trial court use the question in the format of his
proposed charge.[28]








William and Paula argue that even if they were required to
prove a gift by Aclear and convincing evidence,@ they were
entitled to a presumption of gift because William was a natural object of
Carrie=s bounty, and that
the trial court erred in not so instructing the jury.  The expansion of the gift presumption to
cases where the recipient is a Anatural object@ of the transferor=s bounty arises in
the context of a resulting trust, when one party pays the purchase price for
property but the property is taken in another party's name.[29]  This case does not involve a resulting
trust.  Cases in Texas dealing with a
presumption of gift arising outside of the resulting trust context have applied
the presumption only in transfers from parent to child.[30]  William was not Carrie=s child.  Therefore, the trial court properly did not
instruct the jury as to presumption of gift. 
Because William and Paula were not entitled to a presumption of gift,
and the trial court correctly instructed the jury that a gift must be proven by
Aclear and
convincing evidence,@ we overrule William and Paula=s third and fourth
issues.

Exclusion of Evidence








In their fifth issue, William and Paula argue that the
trial court erred by excluding the testimony of Vicky Meyer.  Meyer had been a financial advisor to Carrie
when she lived in Georgia, and William and Paula wished to use her testimony
from a hearing in another proceeding to rebut testimony as to Carrie=s mental capacity
and as to whether William knew before Carrie=s death about the
$300,000 annuity Carrie purchased of which he was beneficiary.  They argue that (1) Meyer was unavailable under
the meaning of Tex. R. Evid. 804
and her prior testimony fits within that rule=s definition of Aformer testimony,@ and (2) their
failure to list her as a witness did not cause undue surprise or prejudice to
Jamieson.

A trial court=s rulings
admitting or excluding evidence are reviewable under an abuse of discretion
standard.[31]  An appellate court must uphold the trial
court=s evidentiary
ruling if there is any legitimate basis in the record for the ruling.[32]  We will not reverse a trial court=s judgment because
of an erroneous evidentiary ruling unless the ruling probably caused the
rendition of an improper judgment.[33]  The complaining party must usually show the
whole case turned on the evidence at issue.[34]  We examine the entire record in making this
determination of harm.[35]  








To have Meyer considered Aunavailable@ under the rule,
William and Paula had to show that they had been unable to procure Meyer=s testimony Aby process or
other reasonable means.@[36]  At trial William and Paula=s attorney
admitted that he had not attempted to locate Meyer but argued that because she
was beyond the trial court=s subpoena power,
she was Aunavailable@ within the
meaning of Rule 804.  Merely asserting to
the trial court that the witness is beyond the court=s subpoena power
does not qualify the witness as unavailable.[37]  The trial court did not abuse its discretion
in finding that William and Paula had not met the requirements of Rule 804 for
admitting her prior testimony. 

Because we hold that the trial court did not abuse its
discretion in excluding the testimony, we need not reach William and Paula=s argument that
the introduction of Meyer=s testimony did not cause unfair surprise
or prejudice to Jamieson.[38]  We overrule William and Paula=s fourth issue.

Trial by Consent








In their final issue, William and Paula argue that the
trial court erred in ruling that the issue of Carrie=s mental capacity
was tried by consent and thus in allowing Jamieson to amend her pleadings
during trial to include the claim that Carrie Mae did not have the mental
capacity to make the alleged gifts to William. 
Whether to allow a party to amend its pleadings is within the trial
court=s discretion.[39]  We do not need to address the issue of
whether the trial court abused its discretion in allowing Jamieson to amend her
pleadings because the error, if any, was harmless.  








Error is harmful if it probably caused the rendition of an
improper judgment.[40]  In this case, no jury question specifically
asked about Carrie=s capacity; the issue only arises as one
consideration the jury could have made in deciding whether Carrie made a gift
to William and Paula.  Jamieson did not
have to prove that Carrie was incapable of making a gift to William and Paula;
rather, William and Paula had to prove that Carrie did make a gift to them.[41]  Even if neither side presented evidence of
Carrie=s capacity, the
jury could have properly found that although Carrie had the capacity to do so,
she did not make a gift to William and Paula. 
Consequently, William and Paula have not shown that allowing Jamieson to
amend her pleadings, even if it was error, probably caused the rendition of an
improper verdict.[42]  We overrule William and Paula=s final issue.

Conclusion

Having overruled each of William and Paula=s issues, we
affirm the trial court=s judgment.

 

LEE ANN
DAUPHINOT

JUSTICE

PANEL B:    DAUPHINOT, GARDNER, and MCCOY, JJ.

DELIVERED:  November 30, 2006

 











[1]See Tex. R.
App. P. 47.4.





[2]Uniroyal Goodrich Tire Co. v.
Martinez, 977
S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S. 1040 (1999);
Robert W. Calvert, ANo
Evidence@ and
AInsufficient
Evidence@
Points of Error, 38 TEX. L.
REV. 361, 362-63 (1960).





[3]City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).





[4]Cont=l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996); Leitch
v. Hornsby, 935 S.W.2d 114, 118 (Tex. 1996).





[5]Rocor Int=l, Inc. v. Nat=l Union Fire Ins. Co., 77 S.W.3d 253, 262 (Tex. 2002).





[6]Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965).





[7]Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex.), cert.
denied, 525 U.S. 1017 (1998).





[8]Sterner
v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989) (negative jury
finding where party bears the burden of proof represents the jurors=
refusal to find the party has met the applicable standard of proof and Ameans,
in law, that the defendant failed to carry its burden of proof.@).





[9]Tex. Civ. Prac. & Rem. Code Ann ' 41.001(2) (Vernon Supp. 2006); Transp.
Ins. Co. v. Moriel, 879 S.W.2d 10, 31 (Tex. 1994).





[10]In re
G.M., 596 S.W.2d 846, 847 (Tex. 1980); State v. Addington, 588
S.W.2d 569, 570 (Tex. 1979).





[11]Addington, 588
S.W.2d at 570.





[12]Diamond
Shamrock Ref. Co. v. Hall, 168 S.W.3d 164, 170 (Tex. 2005); Sw.
Bell Tel. Co. v. Garza, 164 S.W.3d 607, 622, 625 (Tex. 2004).





[13]Hall, 168
S.W.3d at 170; Garza, 164 S.W.3d at 627.





[14]Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001); Sterner v.
Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989); Kitchen v. Frusher,
181 S.W.3d 467, 473 (Tex. App.CFort Worth 2005, no pet.).





[15]Dow
Chem. Co., 46 S.W.3d at 241; see also City of Keller,
168 S.W.3d at 827; Kitchen, 181 S.W.3d at 473.





[16] Dow
Chem. Co., 46 S.W.3d at 241; Sterner, 767 S.W.2d at
690;  Kitchen, 181 S.W.3d at
473-74.





[17]Hall, 168
S.W.3d at 170; Garza, 164 S.W.3d at 627.





[18]Hall, 168
S.W.3d at 170; Garza, 164 S.W.3d at 627.





[19]Hall, 168
S.W.3d at 170; Garza, 164 S.W.3d at 627.





[20]City
of Keller, 168 S.W.3d at 817; Hall, 168 S.W.3d at
170.





[21]City
of Keller, 168 S.W.3d at 827.





[22]See id.
at 820 (Jurors are the sole judges of witness credibility, but jurors may not
disregard testimony that is undisputed when it is Aclear,
positive, direct, otherwise credible, free from contradictions and
inconsistencies, and could have been readily controverted.@).





[23]See
Dow Chem. Co., 46 S.W.3d at 241; Sterner, 767 S.W.2d at
690; Kitchen, 181 S.W.3d at 473.





[24]See
Bandy v. First State Bank, Overton, Tex., 835
S.W.2d 609, 622 (Tex. 1992).





[25]Somer
v. Bogart, 749 S.W.2d 202, 204 (Tex. App.CDallas
1988, writ denied) (holding that the proper burden of proof in rebutting
presumption of gift is clear and convincing evidence).





[26]See Hayes v. Rinehart, 65
S.W.3d 286, 289 (Tex. App.CEastland 2001, no pet.).





[27]See
Tittizer v. Union Gas Corp., 171 S.W.3d 857, 862 (Tex. 2005) (Aa
party cannot complain on appeal that the trial court took a specific action
that the complaining party requested.@); see also Neasbitt v.
Warren, 22 S.W.3d 107, 112 (Tex. App.CFort Worth 2000, no pet.); Doucet
v. Owens‑Corning Fiberglas Corp., 966 S.W.2d 161, 165 (Tex. App.CBeaumont
1998), cert. denied, 526 U.S. 1131 (1999) (Aparty
cannot encourage the court to take a particular action and then complain on
appeal that the trial court erred by taking it.@).





[28]See Tex. R. App. P. 33.1(a); State Dept.
of Highways & Public Transp. v. Payne, 838 S.W.2d 235, 241 (Tex. 1992)
(Atest
for determining if a party has preserved error in the jury charge . . . is
whether the party made the trial court aware of the complaint, timely and
plainly, and obtained a ruling.@).





[29]See
Somer, 749 S.W.2d at 204; Leyva v. Pacheco, 163 Tex. 638, 358 S.W.2d
547, 550, (Tex. 1962) (AWhere
a transfer of property is made to one person and the purchase price is paid by
another, and the transferee is a natural object of bounty of the person by whom
the purchase price is paid, and the latter manifests an intention that the
transferee should not have the beneficial interest in the property, a resulting
trust arises.@).





[30]See Richardson
v. Laney, 911 S.W.2d 489, 492 (Tex. App.CTexarkana 1995, no pet.) (AWhen,
as here, property is deeded from a parent to a child or children, it is
presumed that a gift was intended.@); Oadra v. Stegall,
871 S.W.2d 882, 891 (Tex. App.CHouston [14th Dist.] 1994, no
pet.) (AA
presumption of gift arises if a parent delivers possession, conveys title, or
purchases property in the name of a child. 
We have found no cases where the presumption arises when a child does
the same for a parent.@)
(citations omitted).





[31]Nat=l Liab. & Fire Ins. Co. v.
Allen, 15 S.W.3d
525, 527 (Tex. 2000). 





[32]Owens-Corning Fiberglas Corp. v.
Malone, 972 S.W.2d
35, 43 (Tex. 1998).





[33]Horizon/CMS Healthcare Corp. v.
Auld, 34 S.W.3d
887, 906 (Tex. 2000); Owens-Corning Fiberglas Corp., 972 S.W.2d at 43.





[34]City of Brownsville v. Alvarado, 897 S.W.2d 750, 753-54 (Tex.
1995). 





[35]Interstate Northborough P=ship v. State, 66 S.W.3d 213, 220 (Tex. 2001).





[36]Tex. R. Evid. 804(a)(5); Hall v. White,
525 S.W.2d 860, 862 (Tex.1975) (party offering the testimony must prove witness=
unavailability).





[37]See
Owens‑Corning Fiberglas Corp., 972 S.W.2d at 44 (attorney=s
statement that witness was not subject to court=s
subpoena power did not establish witness= unavailability).





[38]See Tex. R. App. P. 47.1.





[39]Tex. R. Civ. P. 66; State Bar of Tex. v.
Kilpatrick, 874 S.W.2d 656, 658 (Tex.), cert. denied, 512 U.S. 1236,
114 S. Ct. 2740 (1994).





[40]Tex. R.
Civ. P. 44.1(a); Romero
v. KPH Consolidation, Inc., 166 S.W.3d 212, 225 (Tex. 2005).





[41]See Woodworth v. Cortez, 660 S.W.2d 561, 564 (Tex. App.CSan Antonio 1983, writ ref=d n.r.e.); Diaz v. Cantu,
586 S.W.2d 576, 580 (Tex. Civ. App.CCorpus Christi 1979, writ ref=d n.r.e.).





[42]See Tex.
R. App. P. 44.1(a).