COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-380-CV

ESTATE OF CARRIE MAE GLENN, DECEASED

------------

FROM PROBATE COURT NO. 2
 OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Appellants William and Paula Glenn appeal from a jury verdict that they conspired to convert and William did convert three checks from Carrie Mae Glenn.  In five issues on appeal, William and Paula argue that (1) the evidence is legally insufficient to support the jury’s verdict, (2) the evidence is factually insufficient to support the jury’s verdict, (3) the trial court applied the wrong burden of proof, (4) the trial court erred by excluding certain evidence, and (5) the trial court erred by concluding that the issue of Carrie’s mental capacity was tried by consent and, as a result, the trial court improperly gave Appellee administratrix Lisa H. Jamieson leave to amend her pleadings during trial.  Because we hold that the evidence presented at trial was legally and factually sufficient, that the trial court did not err in its allocation of the burden of proof, that the trial court did not abuse its discretion by excluding the testimony of Vicky Meyer, and that the error, if any, in allowing the administratrix to amend her pleadings was harmless, we affirm.

Facts

Three checks, all payable to Carrie, are at issue in the instant suit:  a $33,871.40 cashier’s check from First Union Bank (“check one”); a $80,000 cashier’s check from Region’s Bank (“check two”); and a $57,017.49 check (“check three”), the proceeds from the sale of Carrie’s house.  The events relating to the cashing of these three checks are relevant to the jury’s findings that Carrie did not make a gift of any of these checks to William or Paula, and that William and Paula conspired to convert and William did convert the proceeds of these checks.

Carrie died on February 26, 2002, at the age of ninety-seven.  Her will named William as executor of her estate.  William’s wife Paula was not named in the will.  Carrie had no children of her own but had raised William’s father, and William and his siblings referred to her as “Aunt Carrie” and considered her a grandmother.  In 1998, Carrie’s will contained specific bequests of money totaling more than $254,000.00 to William, his siblings, and others.

In 2000, at Carrie’s request, William moved Carrie from her home in Augusta, Georgia, to his home in Colleyville, Texas.  He later moved her to a nursing home when he felt he could no longer adequately care for her.

Before leaving Georgia, William took Carrie to First Union Bank, one of her two banks, where he helped her close her account and obtain check one.  They also made arrangements with Carrie’s other bank, Regions Bank, for the remainder of her money ($80,000.00) to be sent to William’s home in the form of a cashier’s check (check two).

On August 15, 2000, shortly after returning to Texas with her, William took Carrie to his Fort Worth bank, OmniAmerican Credit Union, where William opened a certificate of deposit (“CD”) in his name, funded with check one (“CD 1”
).  Carrie was not made a beneficiary of this CD.  The parties dispute whether this account was or should have been jointly owned by William and Carrie.  The application form filled out to open the CD, which William signed, identified Carrie as William’s mother and noted that the CD was to be issued in their joint names.  The OmniAmerican employee who opened the CD for William and Carrie testified by deposition that the CD was issued in both names at Carrie’s request.  William claimed at trial that Carrie had given him the check, but that the bank employee used “an improper form,” and that Carrie owned no part of the CD.  The physical certificate mailed to William’s home lists his name only.
  The bank records introduced at trial do not explain why, if the application form listed joint owners, the CD ultimately listed only William’s name.

Next, check two arrived at William’s house, and on August 29, 2000, William returned to OmniAmerican, where William used the check to purchase in his name a $70,000.00 CD (“CD 2”
).
  This CD lists Carrie as a beneficiary but not as a joint owner.  The remaining $10,000.00 from check two was converted into a cashier’s check by OmniAmerican and deposited into a joint checking account in William and Carrie’s names at a Colleyville branch of Chase Bank.

William and Paula discussed the removal of Carrie from the two CDs at OmniAmerican, and on October 4, 2000, Carrie was removed from all accounts at OmniAmerican, and Paula was added as a beneficiary on all accounts.  William and Paula both signed the necessary form, and they testified at trial that Carrie also signed the form.  Jamieson, however, introduced copies of Carrie’s signature on other documents and raised the question of whether Paula had forged Carrie’s signature on the form.

Carrie’s house in Georgia sold in 2001, and she received check three, which contained the proceeds from the sale.  On April 6, 2001, William deposited the check in the Chase account.  In his deposition before trial, William stated that he and Carrie jointly owned the funds in the Chase account, but at trial he testified that Carrie gave him the check as a gift, and he denied that Carrie owned any part of the Chase joint account except the retirement benefits from her deceased husband that were automatically deposited in the account each month.

In September 2001, CD 1 and CD 2 matured, and William rolled them into one $100,000 CD (“CD 3”
).  Paula was made a joint owner.
  Carrie was not made a joint owner or beneficiary.
  William testified at trial that he was “reasonably certain” that the surplus above $100,000 from CD 1 and CD 2 was deposited in another account William had at OmniAmerican.

At some point before Carrie’s death, William withdrew $30,000 from the Chase joint account and opened yet another CD (“CD 4”
).  Carrie was not made a joint owner or beneficiary of CD 4.

Carried died in February 2002.  William testified that at the time of Carrie’s death the Chase joint account had a balance of approximately $15,000.00, and that shortly after her death he closed the account and destroyed the bank records relating to it.  He had previously used funds from the Chase account to open a $100,000 annuity.  William could not say definitively what he did with the $15,000 but said he was “sure” that he either moved the money into another account he had with Chase or added it to the annuity.

When CD 3 matured, William used the funds to open a $200,000 annuity.  At some point, William learned that he was the beneficiary of a $300,000 annuity purchased by Carrie before she moved to Texas.  At trial there was some dispute about whether William knew about the annuity before Carrie died or only found out about it after her death.
  William claimed at trial that throughout all of the events described, Carrie told William and Paula that she was giving William the money from the three checks.

After Carrie’s death, William presented her will for probate.  At that time, her estate did not have enough money to pay the bequests in the will.  William’s siblings, Martha Dillehay, Jean Woodard, and John Robert Glenn, contested William’s appointment as executor, alleging among other things that he had wrongfully taken assets from Carrie’s estate.  After a hearing, the trial court appointed Lisa H. Jamieson as the administratrix.  She then brought the present suit against William and Paula, alleging that they had conspired to convert and that William did convert $170,888.89 of Carrie’s money prior to her death.  After a jury trial, the trial court entered a final judgment for Jamieson for $171,000, plus $20,295.12 prejudgment interest.  The judgment was against William and Paula jointly and severally, and they filed a timely notice of appeal.

Analysis

Legal and Factual Sufficiency

In their first and second issues, William and Paula argue that there is no evidence to support the jury’s verdict on conspiracy, gift, and conversion, and that there is insufficient evidence to support the jury’s verdict on conversion. 

A legal sufficiency challenge may only be sustained when:  (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.
(footnote: 2)  In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could, and disregard evidence contrary to the finding unless a reasonable factfinder could not.
(footnote: 3)  Anything more than a scintilla of evidence is legally sufficient to support the finding.
(footnote: 4)  More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact.
(footnote: 5)
 An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered.
(footnote: 6)  
We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding.
(footnote: 7)
 The jury charge defined conversion as “the unauthorized and unlawful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner’s rights.”  The jury was instructed that to succeed on a conversion claim, a plaintiff has to show “title, right to possession, and a demand for return of the property unless the possessor's acts manifest a clear repudiation of the plaintiff's rights.”  The only disputed question at trial with respect to the conversion elements was whether William had exercised dominion and control over the property in question to the exclusion of or inconsistent with Carrie’s rights, as Jamieson contends, or whether Carrie had given the property to William as a gift.

Jamieson’s witnesses testified that Carrie had trouble seeing without a magnifying glass and that even with a magnifying glass, she had trouble reading documents.  The evidence also showed that Carrie sometimes had difficulty recognizing people.  Witness testimony also suggested that Carrie was on good terms with the rest of William’s family and that she wanted some of her property to go to them.  Another witness testified that Paula told her that Carrie had Alzheimers, raising a question at least as to whether Paula could believe that Carrie was competent to make a gift of her property.  Janice Austin, a friend of Carrie and her neighbor in Georgia, testified by deposition that while Carrie still lived in Georgia, she had helped Carrie write out her bills and reviewed her bank statements for her for several years because Carrie could not see well enough to write her own checks or review documents.
  She further testified that Carrie was reluctant to give away property before her death and that she had never known Carrie to give money or property to another person.

Jamieson also presented evidence specific to each check.  Deposition testimony of Alison Crowder, the OmniAmerican employee who opened CD 1, stated that Carrie had said this CD should be jointly owned by her and William and that the CD was so issued.  William signed the application form stating the account should be joint with Carrie.  The testimony at trial did not definitively establish why the certificate ultimately mailed to William was in William’s name alone.
  When the CD matured, William used the funds to open CD 3 in his and Paula’s names; Carrie was not listed even as a beneficiary.

With respect to the second check, William testified that he took most of the funds and opened a CD in his name and listed Carrie as a beneficiary, but he later removed her from the account.  When the CD matured, he used its proceeds along with the proceeds from CD 1 to open CD 3.

William testified that he saw Carrie sign the first page of the authorization form removing her as beneficiary from the second OmniAmerican CD, but Jamieson contended at trial that the “Glenn” in Carrie’s alleged signature appears identical to that in Paula’s signature on the same page.  She introduced copies of documents signed by Carrie near the time that Carrie allegedly signed the authorization form, and the jury could have properly concluded that Carrie did not sign the authorization form.

William testified that he took $10,000 from check two and deposited it in the joint checking account at Chase.  Check three was also deposited in this account.  William destroyed the bank records for this account after Carrie died, and he refused to obtain copies of these records from the bank even when Jamieson served him with a request for production.  He testified that he considered the Chase account his personal account, and that although the account was set up as a joint account, Carrie did not have a debit card for the account and he had exclusive possession of the checkbook for the account. William further testified that shortly after Carrie died, he moved the funds in the Chase account, approximately $15,000, either into his own account or into the annuity he purchased with other funds from the Chase account.  At his deposition, William acknowledged that Carrie “absolutely” jointly owned the Chase account but then at trial changed his testimony to say that the only funds in the Chase account that she owned were her railroad retirement benefits.  Before Carrie died, he took $30,000 from the Chase account and bought a CD for which Carrie was not listed as joint owner or beneficiary. This evidence presented at trial is enough to furnish some reasonable basis for differing conclusions by reasonable minds about whether William exercised dominion and control over Carrie’s property to the exclusion of or inconsistent with Carrie’s rights.  We therefore hold that the evidence presented by Jamieson is legally sufficient to support the jury’s verdict on conversion.  We further hold that the evidence presented at trial was factually sufficient to support the jury’s verdict of conversion because we cannot say that the evidence supporting the conversion verdict is so weak or that the evidence to the contrary is so overwhelming that the verdict should be set aside.

William and Paula argue that, assuming William had to show a gift by clear and convincing evidence, he met this burden because the only evidence before the jury with respect to the three checks was that the checks were completed gifts to William.  The jury was instructed that in order to find a valid 
gift by a person during the person’s lifetime,“it must be shown that the donor clearly intended to make such gift, and that there was a present delivery of the property of such character as to divest the donor of the title, dominion, and control over it.”  The jury answered “no” to the question of whether it found, by clear and convincing evidence, that Carrie had made a gift to William of the three checks in question, meaning that William and Paula failed to carry their burden of proof on this issue.
(footnote: 8)
 Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.
(footnote: 9)  This intermediate standard falls between the preponderance standard of civil proceedings and the reasonable doubt standard of criminal proceedings.
(footnote: 10)  While the proof must weigh heavier than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed.
(footnote: 11)
 This higher burden of proof elevates the appellate standard of legal sufficiency review 
of evidence supporting a finding that must be proved by clear and convincing evidence
.
(footnote: 12)  When a party challenges on legal sufficiency grounds a finding for the party who had the burden of proof on the issue, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true.
(footnote: 13) 
 
When the party challenges an adverse finding on an issue for which that party had the burden of proof, the party “must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue.”
(footnote: 14)  We must first review the record for evidence supporting the finding, “while ignoring all evidence to the contrary,”
(footnote: 15) and if no evidence supports the finding, we must then look at the entire record “to determine if the contrary proposition is established as a matter of law.”
(footnote: 16)
 We must review all the evidence in the light most favorable to the finding.
(footnote: 17)  This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so.
(footnote: 18)  We must also disregard all evidence that a reasonable factfinder could have disbelieved.
(footnote: 19)  We must consider, however, undisputed evidence even if it is contrary to the finding.
(footnote: 20) 
 That is, we must consider evidence favorable to the finding if a reasonable factfinder could, and disregard evidence contrary to the finding unless a reasonable factfinder could not.
(footnote: 21)
 William and Paula contend that the only evidence in the record about the transactions involving these three checks is that they were completed gifts to William.  We disagree.  With respect to check one, Alison Crowder testified that Carrie wanted the CD to be jointly owned by Carrie and William.  As to check three, William admitted in his deposition testimony that the funds in the Chase account, which were made up in part by check three, were jointly owned by him and Carrie, although he contradicted this statement at trial.  With respect to check two, there is no direct evidence that Carrie did not give this check to William, but there was some evidence that Carrie would not have made an 
inter vivos
 gift of her money.  Further, William’s and Paula’s testimony that Carrie gave the check to William was not “clear, positive, direct, otherwise credible, [and] free from contradictions and inconsistencies.”
(footnote: 22)  During the proceedings both William and Paula contradicted their earlier deposition testimony, and they repeatedly gave vague, evasive, or non-responsive answers to the opposing counsel’s questions.  The jury properly could have found their testimony not credible.
 

Because Jamieson presented evidence that the jury could have credited that Carrie did not make a gift of the checks to William, and the jury properly could have found that William and Paula’s testimony was not credible, 
we cannot say
 that 
the evidence establishes, as a matter of law, all vital facts in support of William and Paula’s claim.
(footnote: 23)  Accordingly, we hold that the evidence is legally sufficient to support the jury’s findings on this issue.

William and Paula also argue that there is no evidence to support the jury’s finding that 
Paula conspired with William to convert Carrie’s property.  The jury was instructed that for William and Paula to be a part of a conspiracy, they “must have knowledge of, agree to, and intended a common objective or course of action that resulted in damages to Carrie.”  The jury was further instructed that one or both of them must have performed some act in furtherance of the conspiracy.

In her testimony, Paula stated that William “discusses [with her] almost anything of significance in [their] marriage,” and William testified that he discussed with Paula removing Carrie as beneficiary on all OmniAmerican accounts and adding Paula as beneficiary on all accounts.  Paula further testified that she signed the form that added herself as beneficiary on all OmniAmerican accounts, and she admitted that she knew the same form would remove Carrie from the accounts
.  Jamieson offered exhibits that raised a question of whether Paula had forged Carrie’s signature on the same form.  
Paula also became a joint owner on CD 3 while Carrie was still alive.

The evidence presented at trial is legally sufficient to furnish some reasonable basis for differing conclusions by reasonable minds about whether Paula knew of, agreed to, and intended a course of action with William that resulted in damages to Carrie.  We have previously held that the evidence is sufficient to support a finding that William converted Carrie’s property, satisfying the requirement of an act in furtherance of the conspiracy.  
We therefore hold that the evidence is legally sufficient to support the jury’s verdict on conspiracy.

Because we hold that the evidence is legally sufficient to support the jury’s verdict on gift, conspiracy, and conversion, and factually sufficient to support the jury’s verdict on conversion, we overrule William and Paula’s first and second issues.

Burden of Proof

In their third issue, William and Paula argue that the trial court placed an improper burden on both parties at trial.  They first argue that Jamieson should have been required to show both Carrie’s lack of donative intent and conversion by them by “clear and convincing evidence.”  The proper burden of proof for a claim of conversion is preponderance of the evidence,
(footnote: 24) and Jamieson would have had to show lack of donative intent only if she wanted to rebut a presumption of gift.
(footnote: 25)  Because, as we hold below, William and Paula were not entitled to a presumption of gift, Jamieson had no such burden at trial.  The trial court therefore placed the proper burden on Jamieson.

William and Paula next argue that the trial court erred by requiring them to prove a gift by “clear and convincing evidence” and by not instructing the jury on presumption of gift.  A party claiming a gift has the burden to prove the gift by “clear and convincing evidence.”
(footnote: 26)  Further, in their motion for directed verdict, William and Paula’s attorney stated, “As I understand the law, the burden then shifts to my clients to prove by 
clear and convincing evidence
, evidence that is free from contradiction and is uncontroverted, that they meet the three elements the Texas courts have recognized [for proving a gift].” [Emphasis added]  In William and Paula’s proposed charge, they requested an instruction that in order for William to establish the property was a gift, he needed to establish the three elements “by ‘clear and convincing evidence.’”
(footnote: 27) The only objection that William and Paula made with respect to the question containing the instruction on burden of proof was that the gift and conversion issues should be submitted together to prevent inconsistent answers, and their attorney suggested that the trial court use the question in the format of his proposed charge.
(footnote: 28)
 William and Paula argue that even if they were required to prove a gift by “clear and convincing evidence,” they were entitled to a presumption of gift because William was a natural object of Carrie’s bounty, and that the trial court erred in not so instructing the jury.  The expansion of the gift presumption to cases where the recipient is a “natural object” of the transferor’s bounty arises in the context of a resulting trust, when one party pays the purchase price for property but the property is taken in another party's name.
(footnote: 29)  This case does not involve a resulting trust.  Cases in Texas dealing with a presumption of gift arising outside of the resulting trust context have applied the presumption only in transfers from parent to child.
(footnote: 30)  William was not Carrie’s child.  Therefore, the trial court properly did not instruct the jury as to presumption of gift.  Because William and Paula were not entitled to a presumption of gift, and the trial court correctly instructed the jury that a gift must be proven by “clear and convincing evidence,” we overrule William and Paula’s third and fourth issues.

Exclusion of Evidence

In their fifth issue, William and Paula argue that the trial court erred by excluding the testimony of Vicky Meyer.  Meyer had been a financial advisor to Carrie when she lived in Georgia, and William and Paula wished to use her testimony from a hearing in another proceeding to rebut testimony as to Carrie’s mental capacity and as to whether William knew before Carrie’s death about the $300,000 annuity Carrie purchased of which he was beneficiary.  They argue that (1) Meyer was unavailable under the meaning of 
Tex. R. Evid
. 804 and her prior testimony fits within that rule’s definition of “former testimony,” and (2) their failure to list her as a witness did not cause undue surprise or prejudice to Jamieson.

A trial court’s rulings admitting or excluding evidence are reviewable under an abuse of discretion standard.
(footnote: 31)  
An appellate court must uphold the trial court’s evidentiary ruling if there is any legitimate basis in the record for the ruling.
(footnote: 32)  We will not reverse a trial court’s judgment because of an erroneous evidentiary ruling unless the ruling probably caused the rendition of an improper judgment.
(footnote: 33)  
The complaining party must usually show the whole case turned on the evidence at issue.
(footnote: 34)  
We examine the entire record in making this determination of harm.
(footnote: 35)  

To have Meyer considered “unavailable” under the rule, William and Paula had to show that they had been unable to procure Meyer’s testimony “by process or other reasonable means.”
(footnote: 36)  At trial William and Paula’s attorney admitted that he had not attempted to locate Meyer but argued that because she was beyond the trial court’s subpoena power, she was “unavailable” within the meaning of Rule 804.  Merely asserting to the trial court that the witness is beyond the court’s subpoena power does not qualify the witness as unavailable.
(footnote: 37)  The trial court did not abuse its discretion in finding that William and Paula had not met the requirements of Rule 804 for admitting her prior testimony. 

Because we hold that the trial court did not abuse its discretion in excluding the testimony, we need not reach William and Paula’s argument that the introduction of Meyer’s testimony did not cause unfair surprise or prejudice to Jamieson.
(footnote: 38)  We overrule William and Paula’s 
fourth issue.

Trial by Consent

In their final issue, William and Paula argue that the trial court erred in ruling that the issue of Carrie’s mental capacity was tried by consent and thus in allowing Jamieson to amend her pleadings during trial to include the claim that Carrie Mae did not have the mental capacity to make the alleged gifts to William.  Whether to allow a party to amend its pleadings is within the trial court’s discretion.
(footnote: 39)  We do not need to address the issue of whether the trial court abused its discretion in allowing Jamieson to amend her pleadings because the error, if any, was harmless.  

Error is harmful if it probably caused the rendition of an improper judgment.
(footnote: 40)  In this case, no jury question specifically asked about Carrie’s capacity; the issue only arises as one consideration the jury could have made in deciding whether Carrie made a gift to William and Paula.  Jamieson did not have to prove that Carrie was incapable of making a gift to William and Paula; rather, William and Paula had to prove that Carrie did make a gift to them.
(footnote: 41)  Even if neither side presented evidence of Carrie’s capacity, the jury could have properly found that although Carrie had the capacity to do so, she did not make a gift to William and Paula.  Consequently, William and Paula have not shown that allowing Jamieson to amend her pleadings, even if it was error, probably caused the rendition of an improper verdict.
(footnote: 42)  We overrule William and Paula’s final issue.

Conclusion

Having overruled each of William and Paula’s issues, we affirm the trial court’s judgment.

LEE ANN DAUPHINOT

JUSTICE

PANEL B: DAUPHINOT, GARDNER, and MCCOY, JJ.

DELIVERED:  November 30, 2006

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
Uniroyal Goodrich Tire Co. v. Martinez
, 977 S.W.2d 328, 334 (Tex. 1998),
 cert. denied
, 526 U.S. 1040 (1999);
 Robert W. Calvert, 
“No Evidence”
 
and “Insufficient Evidence” Points of Error
, 38 T
EX
. L. R
EV
. 361, 362-63 (1960)
.

3:
City of Keller v. Wilson
, 
168 S.W.3d 802, 827
 (Tex. 2005).

4:
Cont’l Coffee Prods. Co. v. Cazarez
, 937 S.W.2d 444, 450 (Tex. 1996); 
Leitch v. Hornsby
, 935 S.W.2d 114, 118 (Tex. 1996).

5:
Rocor Int’l
,
 Inc. v. Nat’l Union Fire Ins. Co.
, 77 S.W.3d 253, 262 (Tex. 2002).

6:
Garza v. Alviar
, 395 S.W.2d 821, 823 (Tex. 1965).

7:
Mar. Overseas Corp. v. Ellis
, 971 S.W.2d 402, 406-07 (Tex.), 
cert. denied
, 525 U.S. 1017 (1998).

8:
Sterner v. Marathon Oil Co.
, 767 S.W.2d 686, 690 (Tex. 1989) (negative jury finding where party bears the burden of proof represents the jurors’ refusal to find the party has met the applicable standard of proof and “means, in law, that the defendant failed to carry its burden of proof.”).

9:
Tex. Civ. Prac. & Rem. Code Ann 
§
 41.001(2) (
Vernon
 
Supp. 2006
); 
Transp. Ins. Co. v. Moriel
, 879 S.W.2d 10, 31 (Tex. 1994).

10:
In re G.M.
, 596 S.W.2d 846, 847 (Tex. 1980); 
State v. Addington
, 588 S.W.2d 569, 570 (Tex. 1979).

11:
Addington
, 588 S.W.2d at 570.

12:
Diamond Shamrock Ref. Co. v. Hall
, 168 S.W.3d 164, 170 (Tex. 2005); 
Sw.
 
Bell Tel. Co. v. Garza
, 164 S.W.3d 607, 622, 625 (Tex. 2004).

13:
Hall
, 168 S.W.3d at 170; 
Garza
, 164 S.W.3d at 627.

14:
Dow Chem. Co. v. Francis
, 46 S.W.3d 237, 241 (Tex. 2001); 
Sterner v. Marathon Oil Co.
, 767 S.W.2d 686, 690 (Tex. 1989); 
Kitchen v. Frusher
, 181 S.W.3d 467, 473 (Tex. App.—Fort Worth 2005, no pet.).

15:
Dow Chem. Co.
, 46 S.W.3d at 241; 
see also City of Keller
, 168 S.W.3d at 827; 
Kitchen
, 181 S.W.3d at 473.

16: Dow Chem. Co.
, 46 S.W.3d at 241; 
Sterner
, 767 S.W.2d at 690;  
Kitchen
, 181 S.W.3d at 473-74.

17:
Hall
, 168 S.W.3d at 170;
 Garza
, 164 S.W.3d at 627.

18:
Hall
, 168 S.W.3d at 170; 
Garza
, 164 S.W.3d at 627.

19:
Hall
, 168 S.W.3d at 170; 
Garza
, 164 S.W.3d at 627.

20:
City of Keller
, 168 S.W.3d at 817; 
Hall
, 168 S.W.3d at 170.

21:
City of Keller
, 168 S.W.3d at 827.

22:
See
 
id.
 at 820 (Jurors are the sole judges of witness credibility, but jurors may not disregard testimony that is undisputed when it is “clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted.”).

23:
See Dow Chem. Co.
, 46 S.W.3d at 241; 
Sterner
, 767 S.W.2d at 690; 
Kitchen
, 181 S.W.3d at 473.

24:
See Bandy v. First State Bank
,
 Overton
,
 Tex.
,
 
835 S.W.2d 609, 622 (Tex. 1992)
.

25:
Somer v. Bogart
, 749 S.W.2d 202, 204 (Tex. App.—Dallas 1988, writ denied) 
(holding that the proper burden of proof in rebutting presumption of gift is clear and convincing evidence).

26:
See
 
Hayes v. Rinehart
, 65 S.W.3d 286, 289 (Tex. App.—Eastland 2001, no pet.).

27:
See Tittizer v. Union Gas Corp.
, 171 S.W.3d 857, 862 (Tex. 2005) (“a party cannot complain on appeal that the trial court took a specific action that the complaining party requested.”); 
see also Neasbitt v. Warren
, 22 S.W.3d 107, 112 (Tex. App.—Fort Worth 2000, no pet.); 
Doucet v. Owens-Corning Fiberglas Corp.
, 966 S.W.2d 161, 165 (Tex. App.—Beaumont 1998), 
cert. denied
, 526 U.S. 1131 (1999) (“party cannot encourage the court to take a particular action and then complain on appeal that the trial court erred by taking it.”).

28:
See
 
Tex. R. App. P.
 33.1(a); 
State Dept. of Highways & Public Transp. v. Payne
, 838 S.W.2d 235, 241 (Tex. 1992) (“test for determining if a party has preserved error in the jury charge . . . is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.”).

29:
See Somer
, 749 S.W.2d at 204; 
Leyva v. Pacheco
, 163 Tex. 638, 358 S.W.2d 547, 550, (Tex. 1962) (“Where a transfer of property is made to one person and the purchase price is paid by another, and the transferee is a natural object of bounty of the person by whom the purchase price is paid, and the latter manifests an intention that the transferee should not have the beneficial interest in the property, a resulting trust arises.”)
.

30:
See
 
Richardson v. Laney
, 911 S.W.2d 489, 492 (Tex. App.—Texarkana 1995, no pet.) (“When, as here, property is deeded from a parent to a child or children, it is presumed that a gift was intended.”); 
Oadra v. Stegall
, 871 S.W.2d 882, 891 (Tex. App.—Houston [14th Dist.] 1994, no pet.) (“A presumption of gift arises if a parent delivers possession, conveys title, or purchases property in the name of a child.  We have found no cases where the presumption arises when a child does the same for a parent.”) (citations omitted).

31:
Nat’l Liab. & Fire Ins. Co. v. Allen
, 15 S.W.3d 525, 527 (Tex. 2000). 

32:
Owens-Corning Fiberglas Corp. v. Malone
, 972 S.W.2d 35, 43 (Tex. 1998).

33:
Horizon/CMS Healthcare Corp. v. Auld
, 34 S.W.3d 887, 906 (Tex. 2000); 
Owens-Corning Fiberglas Corp.
, 972 S.W.2d at 43.

34:
City of Brownsville v. Alvarado
, 897 S.W.2d 750, 753-54 (Tex. 1995). 

35:
Interstate Northborough P’ship v. State
, 66 S.W.3d 213, 220 (Tex. 2001).

36:
Tex. R. Evid.
 804(a)(5); 
Hall v. White
, 525 S.W.2d 860, 862 (Tex.1975) (party offering the testimony must prove witness’ unavailability).

37:
See Owens-Corning Fiberglas Corp.
, 972 S.W.2d at 44 (attorney’s statement that witness was not subject to court’s subpoena power did not establish witness’ unavailability).

38:
See 
Tex. R. App. P.
 47.1.

39:
Tex. R. Civ. P.
 66; 
State Bar of Tex. v. Kilpatrick
, 874 S.W.2d 656, 658 (Tex.), 
cert. denied
, 512 U.S. 1236, 114 S. Ct. 2740 (1994).

40:
Tex. R. Civ. P.
 44.1(a); 
Romero v. KPH Consolidation
,
 Inc.
, 166 S.W.3d 212, 225 (Tex. 2005).

41:
See Woodworth v. Cortez
, 660 S.W.2d 561, 564 (Tex. App.—San Antonio 1983, writ ref’d n.r.e.); 
Diaz v. Cantu
, 586 S.W.2d 576, 580 (Tex. Civ. App.—Corpus Christi 1979, writ ref’d n.r.e.).

42:
See
 
Tex. R. App. P.
 44.1(a).